# United States Court of Appeals for the Federal Circuit

---

**BRIAN R. BAUDE, JOANNA L. MITCHELL, RANDALL E. FELTNER, JASON K. HUMPHREY, JEFFREY W. KERNEKLIAN, DAVID C. KIRKMAN, KENJI LIGON, KALE M. MOSLEY, RICHARD PERRON, CHRISTOPHER T. PROTT, ROBERT B. RUSSELL, STEVEN P. SCHREFFLER, ERIC SUCIU, JAMES A. TREVINO, JOSEPH WILLIAMS, JR., KIRK M. SHAFFER,**
*Plaintiffs*

**JASON D. ENGLE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-2038

---

Appeal from the United States Court of Federal Claims in Nos. 1:16-cv-00049-EJD, 1:16-cv-00051-EJD, 1:16-cv-00053-EJD, 1:16-cv-00054-EJD, 1:16-cv-00055-EJD, 1:16-cv-00056-EJD, 1:16-cv-00057-EJD, 1:16-cv-00058-EJD, 1:16-cv-00059-EJD, 1:16-cv-00060-EJD, 1:16-cv-00061-EJD, 1:16-cv-00062-EJD, 1:16-cv-00063-EJD, 1:16-cv-00064-EJD, 1:16-cv-00065-EJD, 1:16-cv-00066-EJD, 1:16-cv-00392-EJD, Senior Judge Edward J. Damich.

———————————

Decided:  April 9, 2020

———————————

ELANA NIGHTINGALE DAWSON, Latham & Watkins LLP, Washington, DC, argued for plaintiff-appellant.  Also represented by ROBERT J. GAJARSA, GABRIEL BELL; IAN BEECH PETERSEN, Los Angeles, CA.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE, JOSEPH H. HUNT; ANNIE W. MORGAN, ERIC W. WELCH, United States Air Force, Joint Base Andrews, MD.

———————————

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges*.

Opinion for court filed by *Circuit Judge* O'MALLEY.

Dissenting opinion filed by *Circuit Judge* WALLACH.

O'MALLEY, *Circuit Judge*.

In 2011, an Air Force Selective Continuation Board met to determine whether Lieutenant Colonel Jason D. Engle—then a major in the United States Air Force—should be continued or involuntarily discharged.  Under the appropriate regulation, DoDI 1320.08, Engle would have been within the six-year protective window of the regulation and—as the government concedes—he had no disqualifying information in his record.  But, just prior to the continuation board's meeting, the Secretary of the Air Force issued instructions to decrease the protective threshold for officers like Engle and to reverse the regulatory presumption in favor of continuation.  The continuation board determined that, under these new instructions, Engle

should not be continued.  On November 30, 2011, Engle was formally discharged after serving fifteen years, six months, and two days of active duty.  SAppx104.[1]  Less than six months later, Engle was involuntarily called back up from the reserves, deployed to Kyrgyzstan, and promoted to Lieutenant Colonel.  Now, Engle continues to serve his country, but without the retirement benefits and additional active duty pay for which he would have qualified if he had been presumptively continued under the original regulation.

While the military is given a wide berth with respect to its decision making, its discretion is not wide enough to justify the process it employed in this matter.  The Administrative Procedures Act demands more, and officers like Lieutenant Colonel Engle deserve more.

Engle, on behalf of himself and sixteen others, appeals from a decision of the United States Court of Federal Claims ("Claims Court") upholding denials of petitions for special boards under 10 U.S.C. § 1558 by the Air Force Board for Correction of Military Records ("AFBCMR"). *Baude v. United States*, 137 Fed. Cl. 441 (2018); *see* Appx1 (Judgment).  With respect to Engle's claim, because the Secretary of the Air Force does not have the discretion to rewrite DoDI 1320.08, we reverse the judgment of the Court of Federal Claims and remand for further proceedings.  We dismiss with respect to the remaining claims because Engle, a non-attorney and the sole appellant in this case, cannot represent or assert rights on behalf of other parties.

---

[1]    Appx refers to the appendices attached to Engle's informal brief and supplemental brief.  SAppx refers to the supplemental appendices attached to the government's informal brief and supplemental brief.

## I. BACKGROUND

### A. Relevant Statutory Framework

An officer in the United States Air Force who holds the grade of major must appear before a promotion board to receive further promotions.  10 U.S.C. §§ 611(a), 628(k).  If that officer is twice passed over for promotion, he is typically discharged.  *Id.* § 632(a).  This system is sometimes referred to as an "up-or-out" system.  *Baude*, 137 Fed. Cl. at 447.  An officer who would otherwise be discharged under this "up-or-out" framework may nevertheless remain in active service if a continuation board selects him for continuation.  10 U.S.C. §§ 611, 637.

Congress delegated the authority to promulgate regulations for the selection of active duty majors for continuation to the Secretary of Defense.  *Id.* § 637(e).  Pursuant to this authority, the Secretary of Defense issued Department of Defense Instruction ("DoDI") 1320.08, which governs the operations of selective continuation boards.  In relevant part, the regulation reads as follows:

A commissioned officer on the Active Duty List in the grade of O-4 who is subject to discharge according to [10 U.S.C. § 632] shall normally be selected for continuation if the officer will qualify for retirement . . . within *6 years of the date of continuation.* The Secretary of the Military Department concerned may, *in unusual circumstances such as when an officer's official personnel record contains derogatory information*, discharge an officer involuntarily in accordance with [10 U.S.C. § 632]. When the Secretary of the Military Department concerned intends not to continue larger pools of officers in the grade of O-4 who would qualify for retirement within 6 years of the date of a continuation, the Secretary shall notify the [Under

> Secretary of Defense for Personnel and Readiness]
> of the proposed course of action.

DoDI 1320.08, ¶ 6.3 (emphases added). [2]

These instructions are straightforward. An officer in a certain protective window—six years from retirement—"shall normally be selected for continuation" absent some "unusual circumstance." *Id.* In other words, a department secretary must continue the officer unless there is a reason not to, *e.g.*, derogatory information in their personnel file. The instruction also requires a department secretary to notify the Undersecretary of Defense for Personnel and Readiness before "larger pools" of officers within this six-year protective window are not continued. *Id.*

## B. The Secretary's Instructions

On December 6, 2010, the Secretary of the Air Force ("SecAF") notified the Under Secretary of Defense for Personnel and Readiness ("USD(P&R)") that, in order to "manage our officer corps and bring us within Congressionally mandated end-strength," he intended to "temporarily suspend" selective continuation for O-3 and O-4 officers within six years from retirement. Appx1005 (capitalization normalized). The notification was one paragraph:

> In our continuing efforts to manage our officer corps and bring us within Congressionally mandated end-strength, I intend to exercise my authority contained in DoDI 1320.08, para 6.3, to not selectively continue large pools of twice-deferred officers in the grades of O-3 and O-4 who would otherwise qualify for retirement within 6 years of the date of a continuation. Exceptions to this decision will be some Chaplains (i.e., Catholic Priests), some

---

[2]    These instructions became effective on March 14, 2007. *See* SAppx118.

rated (i.e., Remotely Piloted Aircraft Operators), and some Nurse Corps (i.e., Flight and Operating Room Nurses).

Appx1005. The SecAF did not articulate any "unusual circumstances" that might warrant non-continuation of these officers. *Id.*

### C. Lt. Col. Engle's Involuntary Discharge

On March 7, 2011, Engle, who had served in active duty for over 14 years, was passed over for promotion from major to lieutenant colonel for the second time. *Baude*, 137 Fed. Cl. at 444. As a result, on March 21, 2011, a Selective Continuation Board met to evaluate Engle. *Id.* Unbeknownst to Engle, however, the SecAF had issued a memorandum of instructions to the Selective Continuation Boards that dramatically changed the policy set forth in the regulation. The SecAF's new instructions stated:

Majors who will qualify for retirement within *five years of the convening date of the board* shall normally be continued. Officers not within five years of retirement may be recommended for continuation, *but only if you determine that continuation is clearly in the best interest of the Air Force . . .*

Appx33 (emphases added). This meant Officers now needed at least an additional year of service to be continued as a matter of course. *Id.* The memorandum also instructed the Board to calculate the five-year period, *i.e.*, how far an officer was from retiring, based on when the Board convened, as opposed to the "date of continuation," as required by the regulation, extending the additional

service needed by even more.[3]   *Compare* Appx33*, with* DoDI 1320.08, ¶ 6.3.

In addition, the SecAF's instructions introduced a presumption of non-continuation into the regulation.   The Board could only recommend an officer for continuation who was not within five years of retirement as of the convening date if it determined that "it is clearly in the best interests of the Air Force to do so." Appx33.  As explained below, for officers like Engle—who were less than six years from retirement but not less than five, and who had nothing disqualifying in their record—the Secretary's instructions (1) redefined the time window for presumptive continuation, (2) turned the regulatory presumption on its head, and (3) provided no guidance regarding what should be deemed clearly in the best interests of the Air Force.  Rather than presume that these officers *should* be continued, the instructions told the continuation board to presume they *should not* be.[4]   And, they told the Board that the

---

[3]     Air Force Instruction 36-2501 7.11.3 explains that the "date of continuation" is "normally" measured from seven months after approval of the board results.  Appx23.

[4]     The Secretary's decision to shift the protective window from six years to five, reflected in his instructions to the board, was an uncontested break from the military's normal policy, which, to date, had adhered to the terms of the governing regulation.  The Air Force acknowledged as much when members of Congress asked why the same board that rejected Engle suddenly did not continue 157 majors.  *See* Appx1003 ("In practice, the Air Force (AF) has generally continued to retirement all Majors twice passed over for promotion . . . ."); *see also* Appx1009 ("In accordance with the 'normal' policy contained in the DoDI, the Air Force has traditionally continued officers who are within 6 years of retirement eligibility until 20 years of service,

burden for overcoming that presumption was a high one, which the officers were to bear.

Based on the Secretary's instructions, the continuation board rejected Engle along with 156 other officers. If—as the original regulation required and had always been interpreted by the Air Force—the Board had been told it should normally continue Engle, he almost certainly would have been continued. It is undisputed that Engle had no derogatory information in his record that would have disqualified him from continuation. Indeed, the government concedes as much. *See* Oral Arg. at 20:42–51, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl= 2018-2038.mp3 ("We are unaware of any derogatory information or any decision regarding Engle that was personal in nature, that is not what the record here shows."). Nevertheless, the SecAF approved the continuation board's recommendations on November 30, 2011, and Engle was terminated from the Air Force. *Baude*, 137 Fed. Cl. at 445.

Less than six months after he was formally discharged, Engle was involuntarily called back up from the reserves and deployed to Kyrgyzstan. Despite having been passed over for the position while in active service, moreover, Engle was promoted to Lieutenant Colonel while serving in active duty in the reserves. *See* Oral Arg. at 10:05–10:31 ("[Counsel]: He was actually called back up [from the reserves] involuntarily and deployed to Kyrgyzstan and less than six months after his involuntary discharge in this case, and while serving in active duty in the reserves, was promoted to Lieutenant Colonel.").

D. Procedural History

In 2013, Engle and fifteen other majors petitioned the AFBCMR to convene a special board that would: (1)

---

absent some other reason not to do so, such as where the officer's record contains derogatory information.").

reconsider its non-continuation decisions, and (2) reinstate them into active duty, or (3) grant them retirement benefits under the Temporary Early Retirement Authority program. *Baude*, 137 Fed. Cl. at 446; Appx102. The AFBCMR denied the petition on January 28, 2015. Appx116.

On January 12, 2016, Engle filed a complaint in the Claims Court seeking injunctive relief, back pay, attorney's fees, and restoration to active duty. His case was consolidated with several other cases involving plaintiffs who had also been discharged pursuant to recommendations of the Selective Continuation Board and sought AFBCMR review of those recommendations. As the Claims Court explained, "the substantive crux of Plaintiffs' complaint is a military pay claim resulting from their allegedly wrongful non-retention because of the AFBCMR's denial of their requests for special boards." *Baude*, 137 Fed. Cl. at 449.

At this point, the United States moved to remand the consolidated cases to the AFBCMR. According to the United States, the AFBCMR had not *explicitly* denied plaintiffs' requests to convene special boards. Thus, remand was appropriate before considering whether the denial was lawful. *Id.* at 446. The Claims Court agreed and remanded the case to the AFBCMR on August 29, 2016.

On March 31, 2017, the AFBCMR concluded on remand that there was no need to convene a special board to correct actions taken by the Selective Continuation Board because the plaintiffs failed to show they were victims of an "error or injustice." *Id.*

In the Claims Court, both sides filed cross-motions for judgment on the administrative record. As relevant to this appeal, the plaintiffs argued that the SecAF: (1) violated DoDI 1320.08 by changing the criteria for determining how officers six years from retirement (but not five) were evaluated for continuation; (2) failed to properly instruct the Selective Continuation Board on using the best-qualified method to make continuation decisions; (3) violated

regulations prohibiting the SecAF from convening a continuation board under certain conditions; and (4) erroneously calculated the time at which officers needed to be five years from retirement to be continued based on when the Board convened, instead of when the Board's results were approved.[5] *Id.* at 453.

With respect to the plaintiffs' DoDI 1320.08 challenge, the Claims Court agreed with the AFBCMR, and concluded that the SecAF did not violate the regulation because (1) the SecAF had the authority to modify the regulation in "unusual circumstances"; and (2) there was an "unusual circumstance" to warrant the SecAF's new instructions.

The Claims Court first reasoned that the use of the phrase "shall normally" in the regulation indicates that the SecAF has discretion to modify the regulation in "unusual circumstances." *Id.* at 455. The Claims Court rejected the plaintiffs' argument that the regulation restricts the finding of "unusual circumstances" to those personal in nature. *Id.* In doing so, the Claims Court adopted the AFBCMR's reasoning, agreeing that the language requiring the SecAF to notify USD(P&R) of his intent not to continue "larger pools" of officers implies that "there could be some other categorical basis for denying the continuation." *Id.*

Having determined that the SecAF has the discretion to unilaterally change the regulation, the Claims Court concluded that "there was an unusual circumstance that triggered [the SecAF's] authority" under DoDI 1320.08. The Claims Court determined that the "unusual

---

[5]    The plaintiff also argued that the Secretary violated 10 U.S.C. § 691 by reducing manpower below certain minimum end strength requirements. *Baude* at 137 Fed. Cl. at 453. The Claims Court rejected this argument and Engle is "not pursuing the § 691 argument" here. Appellant Br. 23.

circumstance" was the need to "reduc[e] manpower while also maintaining an appropriate mix of airmen." *Id.* at 455–56. This justification was new. Indeed, the SecAF did not say in his memorandum of instructions that "unusual circumstances" justified the reduced protective threshold. Appx33. Nor did his notification to the USD(P&R) identify any such "unusual circumstances." Appx1005. In fact, the only explanation for the SecAF's actions was the first sentence of his notice, when he stated that he intended to "exercise [his] authority contained in DoDI 1320.08, para 6.3" in response to "continuing efforts to manage our officer corps and bring us within Congressionally mandated end-strength." These efforts were not characterized as abnormal. Appx1005.

This description of an "unusual circumstance" also had not appeared before the AFBCMR. When considering whether there was an "unusual circumstance," the AFBCMR relied on a memorandum submitted by the Air Force Personnel Center Judge Advocate, which stated:

> [T]he requirement to add to the normal force management mix a change in the retirement window for twice nonselected majors to be selectively continued *does* represent an unusual circumstance indicative of the more drastic measures required at that time.

Appx1011 (emphasis in original). The Air Force argued that *narrowing the retirement window* was a "drastic measure[] required at that time," but did not explain why. Nor did it explain what about the normal force management mix drastically needed fixing. Nevertheless, on appeal, the government proposed that the unusual circumstance that permitted revision of the regulatory scheme that had long been in place was "the need to reduce the manpower while maintaining an appropriate mix of airmen." *Baude*, 137 Fed. Cl. at 455. The Claims Court agreed with the government, granted the government's motion for judgment on

the administrative record, and denied the plaintiffs' cross-motion for judgment on the administrative record.

Importantly, to the extent the Secretary wanted or felt compelled to reduce force numbers, there were alternative mechanisms to achieve those ends, all of which provided certain procedural safeguards to officers. For example, the SecAF may use force shaping boards, as authorized under 10 U.S.C. § 638a, to consider for early retirement or discharge regular officers on the active-duty list. 10 U.S.C. § 638a(b) ("Actions which the Secretary of a military department may take with respect to officers of an armed force when authorized to do so under subsection (a) are the following . . . ."). But these types of boards may not recommend "more than 30 percent of the number of officers considered." *See* 10 U.S.C. § 638a(c)(1), (d)(2), (e)(3). The Air Force may also encourage voluntary separations and accelerate retirements before resorting to involuntary separation of qualified members who are not eligible for retirement. *See* Appx1006–1008 ("Incentive programs encourage members to voluntarily separate from active duty . . . Inventive programs include the Voluntary Separation Benefit, Special Separation Benefit, and the 15-Year Retirement Program . . . [I]nvoluntary retirements and separations are reduction-in-force (RIF) and selective early retirement boards (SERB).").

Engle timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

We review a decision of the Claims Court granting judgment on the administrative record without deference, applying the same standard of review as the trial court. *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010). We therefore will not disturb the decision of the AFBCMR denying a special board to correct the decision of the Selective Continuation Board "unless it is arbitrary,

capricious, contrary to law, or unsupported by substantial evidence." *Id.*; 10 U.S.C. § 1558(f)(2)(A)(i)–(iv).

Engle argues that the SecAF violated DoDI 1320.08 when he instructed the Board to narrow the continuation-eligibility window from six to five years and changed the calculation date of the protective threshold from the "date of continuation" to the "convening date of the [continuation] board." *Baude*, 137 Fed. Cl. at 457. In particular, Engle argues that (1) the SecAF lacked the authority to modify DoDI 1320.08; (2) the SecAF's instructions were not responsive to the type of "unusual circumstances" contemplated by DoDI 1320.08; and (3) the SecAF's notice to the USD(P&R) does not provide the department secretary with the authority to non-continue officers without reason. Appellant Supp. Br. 7–8. We agree with Engle on each point.[6]

---

6    Before the Claims Court, the government argued that the plaintiffs' challenge with respect to how the Secretary reduced manpower by modifying DoDI 1320.08 is not justiciable. *Baude*, 137 Fed. Cl. at 450. The government also asserted that Engle's "'unusual circumstances' challenges" should be dismissed as "nonjusticiable" because Engle's arguments challenge the SecAF's "wide discretion to manage [the Air Force's] workforce." Appellee Suppl. Br. 13. As did the Claims Court, we disagree. Although claims that military decisions are substantively wrong are nonjusticiable, *procedural* violations underlying military decisions are generally justiciable. *Godwin v. United States*, 338 F.3d 1374, 1376–79 (Fed. Cir. 2003). Engle's case is justiciable because he is challenging whether the SecAF had authority to modify DoDI 1320.08 and whether, under the language of the regulation, the SecAF's instructions complied with DoDI 1320.08. Engle does not challenge the SecAF's general authority to reduce the Air Force's manpower and does not challenge any factual assessment of his

## A.  The Secretary of the Air Force Cannot Rewrite DoDI 1320.08

DoDI 1320.08 states that military secretaries "shall" administer continuation boards based on "the policies and procedures prescribed herein." SAppx118–19. Under this regulation, an officer within six years from retirement "shall normally be selected for continuation." SAppx119. The regulation then states that, in spite of that rule, an individual officer might still be non-continued if there is some "unusual circumstance[]" in his or her case, *e.g.*, derogatory information in his file. *Id.* Otherwise, the officer should be continued. *Id.* Finally, if the military secretary intends to non-continue several O-4 grade officers, the Secretary should notify USD(P&R), which oversees this process on behalf of the Secretary of Defense. *Id.*

The SecAF's instructions to the Selective Continuation Board directly violated DoDI 1320.08. These instructions decreased the protective threshold for O-4 officers both by increasing the required number of years of active service, and by modifying how that number was to be calculated. The threshold date was now calculated from the earlier "convening date of the board," as opposed to the later "date of continuation" stated in the regulation. *Compare* Appx33, *with* DODI 1320.08, ¶ 6.3. *See also* Appx23.

In addition, although the regulation expressly states that an officer within six years from retirement "shall normally be selected for continuation," the SecAF's instructions did not require the Board to justify discharging Engle. Appx33. In fact, they said the opposite. The Secretary told

suitability for service. *See*, *e.g.*, *Roth v. United States*, 378 F.3d 1371, 1385 (Fed. Cir. 2004). Accordingly, we may "decide whether the military has complied with procedures set forth in its own regulations." *Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005).

the Board that majors like Engle should *not* be continued *unless* the Board "determine[d] that continuation [was] clearly in the best interests of the Air Force." *Id.* This is plainly inconsistent with the text of DoDI 1320.08, which provides: "[a] commissioned officer . . . shall normally be selected for continuation if the officer will qualify for retirement . . . within six years . . . ." DoDI 1320.08 ¶ 6.3.

The AFBCMR and the Claims Court justified the SecAF's disregard for the regulation, contending that the use of the phrase "shall normally" does not mandate an action but "merely establishes the norm." *Baude*, 137 Fed. Cl. at 455. But the text of the regulation does not support such a sweeping reading of that language. The regulation's use of "shall normally" is not an invitation for department secretaries to decide who deserves to be *presumptively continued*. It is an instruction that an officer shall normally be continued *absent* unusual circumstances. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018) ("The word 'shall' generally imposes a nondiscretionary duty."). Applying this presumption is mandatory, even if continuation is not.

Indeed, the SecAF's instructions themselves reflect this same understanding. As in DoDI 1320.08, the SecAF used "shall normally" to tell the continuation board that it must *presumptively continue* officers within their newly-minted five-year window. *See* Appx33 ("Majors who will qualify for retirement within five years . . . shall normally be continued."). Just as the continuation board did not have discretion to ignore the Secretary's instruction to presumptively continue officers within five years of retirement, the SecAF did not have discretion to change the DoD-imposed regulatory requirement that officers within six years of retirement should be presumptively continued.

*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969 (2016), on which the dissent relies, does not suggest that "shall normally" is permissive. In fact, the Court acknowledged in *Kingdomware* that the word "shall"

"normally creates an obligation impervious to judicial discretion." 136 S. Ct. at 1977. It has the same effect here. The Secretary must continue officers within six years of retirement unless there is a reason that overcomes the presumption that he must do so. The dissent's reading of "shall normally," by contrast, does not require anyone to do anything. *See* Dissent Op. 8–9. It therefore reads "shall" out of the rule. Indeed, the dissent assumes that the word normally removes any presumption in favor of continuation and effectively turns the word "shall" into no more than a nonce word. Dissent Op. 9.

In further efforts to justify its reading of the rule, the dissent asserts that the SecAF's discretion to "set the criteria for continuation is confirmed in other parts of DoDI 1320.08." Dissent Op. 9 n.4. Here, the dissent points to paragraphs 6.3.1 and 6.3.2. *Id.* But these paragraphs—cited by the dissent as demonstrating the limits of the SecAF's discretion—cap the "Continuation Period" for an officer, *i.e.*, how long the officer can remain in the service *after being continued*.[7] This case, however, is about whether the Secretary can change who should be continued in the first place. Limits on whether the Secretary can keep officers in the service beyond their continuation date—*after they have already been continued*—are therefore irrelevant.

---

[7]    *See, e.g.*, Air Force Instruction 36-2501, *Officer Promotions and Selective Continuation* (Jul. 16, 2004), ¶ 7.11 (explaining, under the heading "Determining Continuation Period," that the Air Force should "[c]ontinue majors until the last day of the month in which he or she is eligible to retire as an officer (normally upon competition of 20 years of total active military service)" unless they "possess critical skills," in which case they still "may not be continued any longer than the last day of the month in which they complete 24 years of active commissioned service").

Because the SecAF was obligated to follow DoDI 1320.08 in overseeing the continuation process here, *see* DoDI 1320.08, ¶ 5.2, corrective action by the AFBCMR is warranted. *See, e.g.*, *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (explaining that correction boards are "obligated not only to properly determine the nature of any error or injustice, but also to take 'such corrective action as will appropriately and fully erase such error or compensate such injustice.'").

### B.  "Unusual Circumstances" Do Not Authorize a Department Secretary to Modify DoDI 1320.08

The government argues that, despite the plain language of the regulation, the Secretary can change the protective window when presented with "unusual circumstances" and that the Secretary has complete discretion to decide what qualifies as an unusual circumstance. The government's argument is unavailing.

DoDI 1320.08 says that a department secretary "may . . . discharge an officer" in unusual circumstances. The text of the regulation is clear: unusual circumstances may overcome the presumption that an O-4 officer within the protective window shall be continued. Not only do "unusual circumstances" not justify doing away with the presumption of continuation, but when "unusual circumstances do come into play, they are to relate to the individual officer's circumstances. Basic rules of grammar compel this conclusion. The "unusual circumstances" clause is not an invitation to the Secretary to blanketly rewrite the regulation. *See, e.g.*, *Starry Assocs., Inc. v. United States*, 892 F.3d 1372, 1380–81 (Fed. Cir. 2018) ("Though the term 'special factor,' standing alone, is ambiguous, Congress's decision to include an example of a qualifying 'special factor' cabins the contextual meaning of the term."). Congress vested that power in the Secretary of Defense alone. 10 U.S.C. § 637(e).

The government and the dissent contend that it is non-sensical to read "unusual circumstances" as "limited to the personal circumstances of the officer." Appellee Supp. Br. 17; Dissent Op. 10–11. The government insists: "nothing in the plain meaning of the instruction precludes the Secretary from identifying unusual circumstances that impacted the Air Force as a whole." *Id.* But context and history suggest otherwise. As to context, the "unusual circumstances" language in the regulation comes after the imposition of a presumption of continuation and is in the sentence referring to the non-continuation of individual officers. The only enumerated example of an "unusual circumstance" in the regulation, moreover, is "when an officer's official personnel record contains derogatory information." DoDI 1320.08, ¶ 6.3. The law is clear that, when interpreting statutes or regulations, the provided example, while not always deemed exclusive, indicates the character of the circumstances to be considered. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 1085 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'"). Accordingly, unenumerated circumstances must be of that same general character and not totally divorced from the circumstances described. Because "[a]n exception to a 'general statement of policy' is 'usually read . . . narrowly in order to preserve the primary operation of the provision,'" we decline the government's invitation to interpret "unusual circumstances" so broadly as to "operate to the farthest reach of [its] linguistic possibilities" in a manner that "contravene[s] the statutory design." *Maracich v. Spears*, 570 U.S. 48, 60 (2013).

As for history, the government's position in this case is inconsistent with how it has defined unusual circumstances in communications to members of Congress and the public and what it conceded to Congress is the Air Force's

long-standing policy. *See, e.g.*, Appx1003 ("[T]he Selective Continuation Board had discretion to nonrecommend continuation of officers with these special skills or more than 15 years of service if the officer's record did not clearly justify continuation (e.g., derogatory information, Article 15s/disciplinary action, referral performance reports)."); Appx1001 (explaining that officers are generally continued unless there is derogatory information in their file). *See also* Appx1009 ("In accordance with the 'normal' policy contained in the DoDI, the Air Force has traditionally continued officers who are within 6 years of retirement eligibility until 20 years of service, absent some other reason not to do so, such as where the officer's record contains derogatory information.").

Advancing new arguments on behalf of the government, the dissent asserts that an "unusual circumstance" is not limited to an individual's circumstances because "Congress expressly 'intended' for the SecAF's selective continuation authority 'to be used sparingly and . . . primarily [as] a means of reducing the numbers in senior [officer] grades when necessary, such as during a reduction in force.'" Dissent Op. 11 (quoting H.R. Rep. No. 96–1462, at 27 (1980)). But the dissent misunderstands the context of the House Report for 10 U.S.C. § 637. Read in the context of the full report, it is clear that Congress is explaining why selective-continuation boards are necessary—*not* whether the need to reduce manpower itself is an "unusual circumstance," nor whether those Boards could be employed in a manner not contemplated by Department of Defense regulations. H.R. Rep. 96–1462, at 27 (1980). The dissent misconstrues Congress's explanation for the implementation of selective-continuation boards as an authorization for the SecAF to use those Boards in a manner that violates the governing regulation, whenever he believes there is a need to reduce manpower.

The regulation is unambiguous. A Selective Continuation Board "shall normally" continue an O-4 grade officer

within six years of retirement absent "unusual circum-stances" in an officer's case, such as derogatory infor-mation.    The "shall normally" language instructs continuation boards what standard to apply: continue an officer unless there is a reason not to do so.  It is not merely a suggestion.  Under the plain language of the regulation, the SecAF's instructions violated DoDI 1320.08 and misin-terpreted the regulation.

## C.  The Secretary of the Air Force Did Not Identify Any "Unusual Circumstances"

Furthermore, even if the SecAF had the authority to declare *any* circumstance to be sufficiently unusual to jus-tify rewriting other aspects of the regulation (which he did not), there simply were no "unusual circumstances" identi-fied here.  "[A] foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2710 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).  This rule requires agency judgments to stand on their own merit. Otherwise, they cannot stand at all.  *Chenery*, 318 U.S. at 88 ("If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment."). Here, that means we may only affirm based on the ra-tionale offered by the SecAF in changing the protective window.

The government concedes that there were no "unusual circumstances" akin to derogatory information in Engle's file that would have justified his non-continuation. *See* Oral Arg. at 20:42–51.  Nor did the SecAF point to any such circumstance in his decision in this matter.  The Se-cAF's notice to the USD(P&R) and memorandum of in-structions, for example, mention no unusual circumstances

of any kind.  Appx1005; Appx33.  That alone should end the inquiry.[8]  *See Chenery*, 318 U.S. at 88.

In spite of this, the Claims Court concluded that "reducing manpower while also maintaining an appropriate mix of airmen" was an "unusual circumstance" that triggered the SecAF's authorization to modify the regulation. *Baude*, 137 Fed. Cl. at 455.  As we explained above, however, there is no such authorization.  The Air Force's force management actions cannot constitute "unusual circumstances" under the governing regulation because the term is limited to those personal in nature.

Even accepting that the unusual circumstance contemplated in the regulation need not be related to the officers' service, the Claims Court's finding is unsupported by the record.  The SecAF's notice, spanning a single paragraph, does not discuss maintaining a certain mix of officers, much less explain why that was an unusual circumstance. *See* Appx1005.  Similarly, the SecAF's memorandum of instructions to the Board does not identify the need to reduce manpower and simultaneously maintain an appropriate mix of airmen, as the Claims Court's opinion purports. *Id.*; *Baude*, 137 Fed. Cl. at 456.  Nor does it define what an appropriate "mix of airmen might be."  Indeed, the SecAF's

---

[8]    The dissent attempts to argue away the government's admission, asserting that "[t]here is simply no record evidence to support this finding [of no unusual circumstances]." Dissent Op. 19.  But the government's admission that there were no unusual circumstances in Engle's personal record is not a factual finding by the court.  It is a concession by the appellee that there were no unusual circumstances, as defined by the regulation.

notice does not even characterize its force management efforts as irregular or "unusual."[9]  Appx1005.

In an attempt to justify a finding of "unusual circumstances" despite the SecAF's failure to identify any, the AFBCMR pulled language from a memorandum submitted by the Air Force Personnel Center Judge Advocate.  The memorandum stated that "the requirement to add to the normal force management mix a change in the retirement window for twice nonselected majors to be selectively continued *does* represent an unusual circumstance indicative of the more drastic measures required at that time." SAppx1011.  This argument is odd.  It merely states that the need to change the protective window was an "unusual circumstance."   But that says nothing about what prompted that need or how it could justify a complete disregard of the regulatory presumption in favor of continuation.  Nor do the AFBCMR's findings.  See Appx109, 115. At most, the AFBCMR generally "adopt[ed]" the Air Force's arguments without providing any further explanation about why the need to reduce manpower gives rise to a need to prematurely non-continue officers in good standing.  Appx114–15.

Accordingly, even if the SecAF *could* deviate from the protective window defined by DoDI 1320.08 in unusual

---

[9]    The dissent contends that the SecAF's failure to identify an unusual circumstance is not a negative claim, but rather, "an incomplete record."  Dissent Op. 19.  The dissent insists that the burden lies on Mr. Engle to establish "prejudicial error."  Dissent Op. 20.  But even the government's own briefing contravenes the dissent's protests. The government admits that, with respect to the decision to non-continue a particular officer, "the plain meaning of DoDI 1320.08, ¶ 6.3 requires the Secretary to bear the burden to identify 'unusual circumstances.'"  Appellee Supp. Br. 2.  The SecAF did not do so.

circumstances, and even if a need for reduction in force while maintaining a certain mix of airmen *could* be considered an unusual circumstance within the meaning of DoDI 1320.08 to justify such a deviation, there is no basis for affirming his decision to do so here.

Finally, as discussed to some extent above, we must reject the dissent's attempts to bolster its reasoning by making arguments that the government has not advanced. It is not the job of the court, the "neutral arbiter," to raise questions that are not presented by the parties. *Greenlaw v. U.S.*, 554 U.S. 237, 244 (2008). "Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment).[10]

We find these *sua sponte* arguments are unpersuasive in any event. *See supra* Sections II.A–C. Neither the plain text of the regulation, the legislative history, nor the SecAF's own notice support the SecAF's decision to modify the protective threshold stipulated in, or reverse the presumption required by, DoDI 1320.08. The dissent's contention that our conclusion "fails to give appropriate weight to this separation of powers" and "divests the Secretary of the Air Force of his authority to meet congressionally mandated end-strength numbers and his discretion to manage the U.S. Air Force's work force" are unpersuasive. Dissent Op. 2, 15. There is no dispute that Congress has the power to mandate end-strength numbers, or that the Air Force has "wide discretion to manage its workforce," *Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014). As

---

[10]    And, as discussed above, "a foundational principle of administrative law [is] that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan*, 135 S. Ct. at 2710.

noted above, the Air Force has "various force management tools" to help attain Congressionally mandated end-strength numbers.  Appx18.  But the SecAF's use of DoDI 1320.08 as an alternative "tool" for reducing manpower was improper because it did not follow the requirements of the regulation, and because the SecAF did not have authority to rewrite the regulation that he violated, one that emanated from the Secretary of Defense.  The need to reach "congressionally mandated end-strength" is not an unusual circumstance—under the regulation or otherwise.  The government itself concedes this point.  Appellee Supp. Br. 18 ("[O]f course the Air Force has had excessive manpower in the past.").  Our holding does not limit the broad discretion of the military to manage its force.  It simply stands for the rule that "government officials must follow their own regulations, even if they were not compelled to have them at all, and certainly if directed to promulgate them by Congress." *Voge v. United States*, 844 F.2d 776 779 (Fed. Cir. 1988) (citing *Service v. dulles*, 354 U.S. 363, 388 (1957)).  The Air Force had a number of ways to reduce manpower, this was just not one of them.

### D.  DoDI's "Notification" Requirement Does Not Allow the Secretary of the Air Force to Non-Continue Officers for Any Reason

Alternatively, the government argues that the last sentence of DoDI 1320.08 ¶ 6.3, which states the Secretary of a Military Department must notify the USD(P&R) before non-continuing "larger pools" of officers within six years from retirement, allows the Secretary to non-continue officers within six years from retirement for any reason.  The government's reading renders the rest of the paragraph superfluous.  For example, the Secretary's power to discharge an officer within six years from retirement in "unusual circumstances" becomes unnecessary if the next sentence allows him to discharge that same officer for any reason he chooses.  Indeed, the government contends that the question of whether unusual circumstances existed is irrelevant

for this very reason. *See* Appellee Supp. Br. 16 ("[E]ven if the Secretary's 'unusual circumstances' determination was erroneous, Engle cannot demonstrate prejudicial error, because DoDI 1320.08 ¶ 6.3 did not require the Secretary reach such a determination."); Oral Arg. at 25:55–26:06 ("[The Court:] So, you are saying that the un-usual circumstances language is irrelevant . . . [Counsel:] Yes, that is our primary argument.").

The government's argument is not persuasive. The language governing non-continuance of "larger pools of officers" stipulates an additional requirement. It is reasonable to assume that, if a department secretary determines that a large pool of O-4 officers should not be continued—even though they should *normally* be continued—the USD(P&R) would want to be apprised of this abnormality. Oral Arg. at 38:28–38:52 ("[Counsel for Appellant]: It is entirely reasonable to expect that the Undersecretary of Defense for Personnel and Readiness would want to know if suddenly, a material number—a critical mass—of officers in a particular military branch were not going to be continued.") The "notification" requirement, however, does not allow the Secretary to depart *sub silentio* from the prior rules that apply to each individual officer. The government's interpretation of the regulation "is thus at odds with one of the most basic interpretive canons:" that a statute or regulation "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." *Corley v. United States*, 556 U.S. 303, 314 (2009). The SecAF effectively "[s]uspend[ed]" Department of Defense regulations in favor of his own rules. Appx1005. *See, e.g., Godwin*, 338 F.3d at 1379 ("The Coast Guard's sphere of discretion . . . does not extend so far that we would ignore [decisions] that are inconsistent with [its] own regulations."). It seems that the final sentence of DoDI 1320.08 is more likely a notification requirement designed to guard against just what happened

here—the use of Continuation Boards for purposes not contemplated by the regulation.

### E.  Remaining Issues

Given our finding that the Secretary of the Air Force's instructions violated DoDI 1320.08 because the Secretary of the Air Force lacked the authority to narrow the protective window or disregard the regulatory presumption in favor of continuation, we do not reach Engle's remaining arguments.

In addition, Engle has requested relief in this case on behalf of himself and the other plaintiffs from the consolidated Claims Court case.  But Engle is not an attorney, so he cannot represent these other plaintiffs.  Federal Circuit Rule 47.3(a) ("An individual . . . may choose to be represented by counsel or to represent himself or herself pro se, but may not be represented by a nonattorney.").  He also cannot rest his claim for relief on their rights and interests. *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]his Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").[11]  We therefore dismiss the claims of the other officers.

---

[11]    There are, of course, important exceptions to this rule. *See, e.g., Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004); *see also* Fed. R. Civ. P. 32.  But none apply here. For example, these cases, though consolidated, were neither asserted nor treated as a class action. *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1539 (2018) ("[C]ourts may not recognize a common-law kind of class action or create de facto class actions at will." (internal quotation marks and ellipses omitted).

## III. CONCLUSION

"It has long been established that government officials must follow their own regulations." *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988). The SecAF modified a regulation that is meant to protect individuals who have spent most of their lives in service to this country. These men and women deserve a system that follows its own rules, and a reviewing forum that does more than rubber-stamp the actions of military officials.

Engle has demonstrated that the AFBCMR's decision is arbitrary, contrary to law, and unsupported by substantial evidence. We therefore vacate the Claims Court's grant of the government's motion for judgment on the administrative record, reverse the Claims Court's denial of plaintiff's cross-motion for summary judgment, and remand, with instructions to convene a special board for reconsideration of Engle's non-continuation through a process consistent with the plain meaning of DoDI 1320.08. *See Baude*, 137 Fed. Cl. at 446.

**DISMISSED-IN-PART, VACATED-IN-PART, REVERSED-IN-PART, AND REMANDED**

COSTS

Costs to appellant.

# United States Court of Appeals
# for the Federal Circuit

---

**BRIAN R. BAUDE, JOANNA L. MITCHELL, RANDALL E. FELTNER, JASON K. HUMPHREY, JEFFREY W. KERNEKLIAN, DAVID C. KIRKMAN, KENJI LIGON, KALE M. MOSLEY, RICHARD PERRON, CHRISTOPHER T. PROTT, ROBERT B. RUSSELL, STEVEN P. SCHREFFLER, ERIC SUCIU, JAMES A. TREVINO, JOSEPH WILLIAMS, JR., KIRK M. SHAFFER,**
*Plaintiffs*

**JASON D. ENGLE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-2038

---

Appeal from the United States Court of Federal Claims in Nos. 1:16-cv-00049-EJD, 1:16-cv-00051-EJD, 1:16-cv-00053-EJD, 1:16-cv-00054-EJD, 1:16-cv-00055-EJD, 1:16-cv-00056-EJD, 1:16-cv-00057-EJD, 1:16-cv-00058-EJD, 1:16-cv-00059-EJD, 1:16-cv-00060-EJD, 1:16-cv-00061-EJD, 1:16-cv-00062-EJD, 1:16-cv-00063-EJD, 1:16-cv-00064-EJD, 1:16-cv-00065-EJD, 1:16-cv-00066-EJD, 1:16-cv-00392-EJD, Senior Judge Edward J. Damich.

---

2                                                    BAUDE v. UNITED STATES

WALLACH, *Circuit Judge*, dissenting.

This case is about the balance between Congress's power to "raise and support Armies," U.S. CONST. art. I, § 8, cl. 12, and the judiciary's authority to "say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *see Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005) (en banc) ("A court may decide whether the military has complied with procedures set forth in its own regulations[.]"). The Majority, neglecting the former in exercise of the latter, misreads paragraph 6.3 of Department of Defense Instruction ("DoDI") 1320.08, *Continuation of Commissioned Officers on Active Duty and on the Reserve Active Status List* (Mar. 14, 2007), and divests the Secretary of the Air Force ("SecAF") of his authority to meet congressionally mandated end-strength numbers and his discretion to manage the U.S. Air Force's ("Air Force") work force. The Majority opinion is incorrect in substance and pernicious in effect. The result is a derogation of civilian control of the military and the good order and discipline of the armed services.

Accordingly, I respectfully dissent.

BACKGROUND

I. Statutory Framework

If an Air Force major has "failed of selection for promotion to the next higher grade for the second time" (that is, "twice-deferred"), the major will, with limited exception, "be discharged" or, if eligible, "retired" from the Air Force. 10 U.S.C. § 632(a)(1), (2). A twice-deferred major may remain in active service if he or she is selected for continuation of service by a selective continuation board. *See id.* § 611(b); *see also id.* § 637. If a twice-deferred major "is within two years of qualifying for retirement[,]" then the selective continuation board must continue him or her on active duty "until he [or she] is qualified for retirement." *Id.* § 632(a)(3); *see id.* § 637(a)(5). If a twice-deferred major

is not within two years of retirement, the SecAF retains discretion over the continuation decision. *Id.* § 637(c) ("Continuation of an officer on active duty under [§ 637] pursuant to the action of a selection board convened under [§] 611(b) . . . is subject to the approval of the Secretary of the military department concerned."). Majors not selected for continuation are "discharged" or "retired." *Id.* § 632(a)(1), (2).

The Secretary of Defense promulgated DoDI 1320.08 pursuant to, inter alia, §§ 611(c) and 637(e). DoDI 1320.08. The SecAF "may, when the needs of the [Air Force] require, convene continuation selection boards according to [§] 611(b)." *Id.* ¶ 6.3. The continuation selection board "shall normally" continue a major who may otherwise be discharged, if that officer "will qualify for retirement . . . within [six] years of the date of continuation." *Id.* The SecAF "may, in unusual circumstances such as when an officer's official personnel record contains derogatory information, discharge an officer involuntarily in accordance with [§] 632." *Id.* If the SecAF "intends not to continue larger pools of officers . . . who would qualify for retirement within [six] years," the SecAF "shall notify the [Department of Defense Undersecretary for Defense for Personnel and Readiness ('USD(P&R)')] of the proposed course of action." *Id.*

## II. Relevant Procedural History

In November 2010, the Air Force briefed the USD(P&R) "on a number of planned measures to reduce officer numbers which included limiting selective continuation of various officers" in order to meet congressionally

mandated end-strength[1] numbers for that fiscal year.[2] SAppx 105; *see* Ike Skelton National Defense Authorization Act for Fiscal Year 2011 ("NDAA FY11"), Pub. L. No. 111-383, § 401, 124 Stat. 4137, 4202 (2011); SAppx 129 (providing the mandated end-strength numbers for the Air Force for Fiscal Year 2011).  In December 2010, the SecAF notified the USD(P&R) that, in furtherance of the Air Force's ongoing "efforts to manage [its] officer corps and bring [the Air Force] within congressionally mandated end-strength, [he] intend[ed] to exercise [his] authority contained in DoDI 1320.08 ¶ 6.3 to not selectively continue large pools of twice-deferred [majors] . . . who would otherwise qualify for retirement within [six] years."  Appx 1005.  The USD(P&R) acknowledged receipt.  SAppx 105.  The Air Force briefed "[c]ongressional subcommittee professional staff members" on the plan in January 2011.  SAppx 105.  The Air Force again briefed the USD(P&R) "on the final plan" at the end of January 2011.  SAppx 105.

In March 2011, Appellant Jason Engle, then a major in the Air Force, was passed over for a promotion to lieutenant colonel for the second time.  *See Baude v. United States*, 137 Fed. Cl. 441, 445 (2018).[3]  A selective continuation

---

[1]    "End-strength" is "the maximum number of personnel each of the military services is authorized to have on the last day of the fiscal year."  SAppx 147 (citation omitted).

"SAppx" refers to the supplemental appendices attached to the Government's informal brief and supplemental brief.  "Appx" refers to the appendices attached to Mr. Engle's informal brief and supplemental brief.

[2]    The Federal fiscal year begins on October 1 of the previous calendar year. *See* 2 U.S.C. § 602(e).

[3]    Because this is an appeal from a consolidated case, the administrative record is not specific to Mr. Engle, but rather to the lead plaintiff in the case below.  *See Baude*,

board ("the Selective Continuation Board") was convened to consider multiple officers, including Mr. Engle, for continuation to retirement eligibility. *Id.* The SecAF instructed the Selective Continuation Board to continue majors "who [would] qualify for retirement within five years of the convening date of the [Selective Continuation Board]." Appx 33. Mr. Engle was within six years of retirement. *Baude*, 137 Fed. Cl. at 445. The Selective Continuation Board declined to recommend 157 out of 245 individuals, including Mr. Engle, for continuation. *See id.* The SecAF approved the Selective Continuation Board's determination, and Mr. Engle and the other 156 majors were involuntarily discharged. *Id.* The Air Force again briefed congressional subcommittee professional staff members in March and May 2011. SAppx 147.

In 2013, sixteen of the 157 majors, including Mr. Engle, (collectively, "Petitioners"), applied separately to the Air Force Board for Correction of Military Records ("AFBCMR") to convene a special board to correct their military records under 10 U.S.C. § 1558. *Baude*, 137 Fed. Cl. at 445; SAppx 104; *see* 10 U.S.C. § 1558 (providing for the "[r]eview of actions of selection boards"). They asked to be reinstated to active duty or, alternatively, granted prorated retirement. SAppx 102. They argued that the SecAF had "violated [DoDI] 1320.08" by "erroneously applying" a continuation eligibility window of five rather than six years to retirement. SAppx 102. The AFBCMR denied the applications, finding "no basis to grant any of the relief requested." SAppx 116.

---

137 Fed. Cl. at 445 (explaining that "Major Brian R. Baude . . . was the first to file his complaint" and that his case was subsequently "consolidate[d] [with] fifteen other cases as they involved the same common questions of fact and law," among them, Mr. Engle's).

Mr. Engle and the other Petitioners then filed separate appeals in the U.S. Court of Federal Claims, and their cases were consolidated. *Baude*, 137 Fed. Cl. at 445. The Court of Federal Claims remanded the consolidated case to the AFBCMR, to consider the Petitioners' request for special boards. *Id.* at 446. On remand, the AFBCMR concluded that there was "no basis to grant [Petitioners] consideration by a special board." SAppx 135. The Petitioners then moved to supplement the administrative record before the Court of Federal Claims. *Baude*, 137 Fed. Cl. at 445. Petitioners sought to compel the Government to supplement the administrative record with, inter alia, "details (copies of the brief provided, briefing materials, transcripts, and any and all correspondence) of the information SecAF briefed to the USD(P&R) [in January 2011] regarding SecAF's intent to not selectively continue certain officers"; "details (copies of the brief provided, briefing materials, transcripts, and any and all correspondence) of the information the Air Force briefed to USD(P&R) and [c]ongressional subcommittee staff members on January 12, 13, and 24, 2011 regarding SecAF's intent to not selectively continue certain officers"; and "details (copies of the brief provided, briefing materials, transcripts, and any and all correspondence) of the information the Air Force briefed to [c]ongressional subcommittee staff members on March 17, 2011[,] and May 11, 2011[,] regarding SecAF's intent to not selectively continue certain officers." SAppx 147. The Court of Federal Claims denied Petitioners' motion, explaining that Petitioners' requested "'details' [were] directed to the [non-justiciable] merits of the Air Force's decision as to whether or not it *should* have reduced its end-strength and *how* it should have reduced its end-strength" and "that despite being before the [AFBCMR] twice, [Petitioners] failed to identify that this evidence was missing during review and, therefore, waived its supplementation rights." SAppx 149 (emphasis in original).

Petitioners and the Government then filed cross-motions for judgment on the administrative record in the Court of Federal Claims. *Baude*, 137 Fed. Cl. at 445. In granting the Government's motion, the Court of Federal Claims determined that the SecAF "did possess the discretion not to continue a major," and that "there was an unusual circumstance that triggered [the SecAF's] authority" under DoDI 1320.08. *Id.* at 455–56.

## DISCUSSION

The Majority concludes that "[t]he SecAF's instructions to the Selective Continuation Board directly violated DoDI 1320.08," Maj. Op. 14, because DoDI 1320.08 ¶ 6.3 requires that the SecAF "continue [an] officer [within six years of retirement] unless there is" an individualized "unusual circumstance" to justify non-continuation, "e.g., derogatory information in their personnel file," *id.* at 5; *see id.* at 17–20. The Majority then finds that there were no individual "unusual circumstances" to merit Mr. Engle's non-continuation, and that, even if non-individualized "unusual circumstances" could justify narrowing eligibility criteria "there simply were no 'unusual circumstances' identified here." *Id.* at 20–21.

The Majority opinion suffers from two critical defects. First, the Majority misreads DoDI 1320.08 ¶ 6.3. Second, the Majority overreaches our standard of review to find facts not on the record.

### I.  The Majority Misconstrues DoDI 1320.08

### A. The Majority Misreads the Plain Language of DoDI 1320.08 ¶ 6.3

"We construe a regulation in the same manner as we construe a statute[.]" *Tesoro Haw. Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005). We first consider "its plain language" and "terms in accordance with their common meaning." *Lockheed Corp. v. Widnall*, 113 F.3d 1225, 1227 (Fed. Cir. 1997). "In doing so, the court considers the

text of the regulation as a whole, reconciling the section in question with sections related to it." *Mass. Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1365 (Fed. Cir. 2015) (internal quotation marks and citation omitted). If the regulation contains "clear and unambiguous" terms, "then no further inquiry is usually required." *Id.*

We begin with the language of the regulation itself. DoDI 1320.08 provides that a twice-deferred major "shall normally be selected for continuation" if the officer is "within [six] years" of retirement on "the date of continuation." DoDI 1320.08 ¶ 6.3. The Majority concludes that the phrase "shall normally" creates a "presumption," Maj. Op. 15, under which the SecAF must "continue [an] officer [within six years of retirement] unless there is a reason not to do so," *id.* at 20. The Majority says that "applying this presumption is mandatory, even if continuation is not." *Id.* at 15. This erroneously reads "normally" out of the regulation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (explaining a "cardinal principal of statutory construction that a statute" or regulation is read so that "no clause, sentence, or word shall be superfluous, void, or insignificant" (internal quotation marks and citation omitted)); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition." (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.))). While use of the word "shall," by itself, is generally mandatory, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998) (explaining that "shall" generally creates "an obligation impervious to judicial discretion" (citation omitted)), "shall normally" is permissive, *see, e.g.*, *SKF USA Inc. v. United States*, 630 F.3d 1365, 1371 (Fed. Cir. 2011) (explaining that statutory language providing that an agency "shall normally" use a specified methodology "does not mandate" use of that methodology); *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1377 (Fed. Cir. 2001) (interpreting the phrase "shall normally" as providing "a general," not mandatory, "rule," leaving

choice of methodology within the reasonable discretion of the agency). Accordingly, "shall normally" conveys the SecAF's discretion to set the criteria for continuation—it creates a norm and provides the discretion to deviate from that norm. *See Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) (explaining that permissive language "implies discretion"); *see also* 10 U.S.C. § 637(c) (providing that continuation is "subject to the approval of the [SecAF]"); *Maier v. Orr*, 754 F.2d 973, 984 (Fed. Cir. 1985) ("The Air Force is entitled to discharge an officer on grounds rationally related to the standards of fitness for retention in that branch of the service." (citation omitted)).[4]

Next, DoDI 1320.08 provides that, even if an officer otherwise meets the criteria for continuation, the SecAF "may, in unusual circumstances such as when an officer's official personnel record contains derogatory information, discharge an officer involuntarily in accordance with

---

[4]     This discretion is confirmed in other parts of DoDI 1320.08. Specifically, the SecAF has discretion to set the length of the period of continuation. 10 U.S.C. § 637(a)(5) (providing guaranteed continuation only for officers "within two years of qualifying for retirement"); DoDI 1320.08 ¶¶ 6.3.1–2 (setting express limits, "Minimum" and "Maximum Continuation Period[s]," thereby acknowledging the SecAF's discretion to act within those limits); Air Force Instruction ("AFI") 36-2501, Officer Promotion and Selective Continuation (July 16, 2004), https://static.e-publishing.af.mil/production/1/af_a1/publication/afi36-2501/afi36-2501.pdf at ¶¶ 7.9 (providing that "[b]ased on the needs of the Air Force, [the] SecAF determines [continuation] eligibility criteria"), 7.11.1 ("The SecAF determines the actual length of the continuation period."), 7.18 ("The period of continuation on active duty may be reduced by the SecAF due to subsequent changes in the 'critical skill needs' of the Air Force.").

[§] 632." DoDI 1320.08 ¶ 6.3. From this, the Majority concludes that the SecAF must find "unusual circumstances" to not continue an officer and that the "unusual circumstances" must "relate to the individual officer's circumstances." Maj. Op. 18. This reading, however, fails to consider regulatory and statutory context. *See Mass. Mut. Life Ins.*, 782 F.3d at 1365. DoDI 1320.08 ¶ 6.3's "unusual circumstances" clause does not divest the SecAF of his discretion to set continuation eligibility criteria according to the needs of the service. *See* 10 U.S.C. § 637(a)(1) (providing that continuation is "subject to the needs of the service"); DoDI 1320.08 ¶ 6.3 (providing that the SecAF "shall normally" continue officers within six years of retirement). Rather, it establishes that an officer who otherwise meets the continuation eligibility criteria, as set by the SecAF, may be involuntarily discharged, rather than retired or continued, in "unusual circumstances." DoDI 1320.08 ¶ 6.3; *see* 10 U.S.C. § 632(a)(1), (2) (providing that an officer not selected for continuation may be "discharged" or, if eligible, "retired"); SAppx 1001 (Air Force Selective Continuation Fact Sheet) (explaining that "those individuals meeting the continuation eligibility criteria will be considered" by the selective continuation board" and "[r]ecords which contain . . . derogatory information may warrant a 'not fully qualified' determination").

Further, even if this language did require the SecAF to find "unusual circumstances" before changing continuation eligibility criteria, nothing in the language of DoDI 1320.08 or relevant statutes limits those "unusual circumstances" to individual "derogatory information." DoDI 1320.08 ¶ 6.3. The Majority provides that "[t]he law is clear that, when interpreting statutes or regulations, the provided example, while not always deemed exclusive, indicates the character of the circumstances to be considered." Maj. Op. 18. "The law," however, is not so absolute—*ejusdem generis* and *noscitur a sociis* cannot "be resorted to" in order "to obscure and defeat the intent and purpose of Congress."

*United States v. Alpers*, 338 U.S. 680, 682 (1950) (citation omitted); *see Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (providing that we rely on "the doctrine of *noscitur a sociis* . . . to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress"). Here, when enacting 10 U.S.C. § 637, Congress expressly "intended" for selective continuation "to be used sparingly and . . . primarily [as] a means of reducing the numbers in senior [officer] grades when necessary, such as during a reduction in force." H.R. REP. No. 96–1462, at 27 (1980); *see* S. REP. No. 96–375, at 81 (1979) (similar). Congress's express purpose was to create a force management tool responsive to congressionally mandated end-strength numbers. *See* H.R. REP. No. 96–1462 at 27 ("With the elimination of the temporary promotion system, some provision for forced separation is required. Otherwise there would be no method of thinning the force at senior grades during a reduction in force."). Reading "unusual circumstances" so narrowly as to defeat this intent and purpose, based on a single, non-exclusive example, is an error. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012) (declining to apply "the rule of *ejusdem generis*" to "defeat Congress' intent"); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (explaining that "[t]he absence of a list of specific items undercuts the inference embodied in *ejusdem generis* [and *noscitur a sociis*] that [the drafter] remained focused on the common attribute when it used the catchall phrase").

Last, DoDI 1320.08 provides that when the SecAF "intends not to continue larger pools of officers . . . who would qualify for retirement within [six] years of the date of a continuation, the [SecAF] shall notify the USD(P&R) of the proposed course of action." DoDI 1320.08 ¶ 6.3. By its plain and ordinary language, the SecAF has the authority and discretion to not continue "larger pools of officers" even if they would otherwise "qualify for retirement within [six]

years." *Id.* The Majority's "individualized decision" requirement presumes that there are "larger pools" of senior officers with derogatory or similar information on their record waiting to be non-continued. The simpler, more realistic, explanation is that the SecAF may, when the needs of the service require, not continue larger pools of officers, in keeping with his discretion and authority. *See* 10 U.S.C. § 637(a)(5) (providing guaranteed continuation only for officers "within two years of qualifying for retirement"); *Beecham v. United States,* 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole [regulation or] statute, not of isolated sentences.").[5] Therefore, DoDI 1320.08 ¶ 6.3 accords the SecAF the discretion to set continuation eligibility criteria, to not continue an officer even if he or she meets that criteria in unusual circumstances, and to not continue large numbers of officers within six years of retirement. *See Lengerich v. Dep't of Interior,* 454 F.3d 1367, 1370 (Fed. Cir. 2006) ("[W]e examine the text of the regulation as a whole, reconciling the section in question with sections related to it.").

B.  The Majority's Reading of DoDI 1320.08 ¶ 6.3 Is Contrary to Statute and Congressional Intent

The Majority's conclusion that the SecAF does not have the discretion to set continuation eligibility criteria is in substantial tension with DoDI 1320.08's enabling statute and congressional intent. Congress provided that selective continuation is "subject to the needs of the service," 10 U.S.C. § 637(a)(1), and "subject to the approval of the [SecAF]," *id.* § 637(c), with guaranteed continuation only for officers "within two years of qualifying for retirement," *id.* § 637(a)(5). In enacting such legislation, Congress sought to "[s]tandardize officer-promotion procedures among the

---

[5]   Mr. Engle does not contest that "the SecAF had the authority to not continue large pools of majors within six years of retirement[.]" Appellant's Supp. Br. 1 n.1.

service" and to "tighten[] up the allowances on the number of officers in the higher grades." 126 CONG. REC. H29,886 (Nov. 17, 1980) (statement of Rep. Mitchell). Congress expressly "intended" for the SecAF's selective continuation authority "to be used sparingly and . . . primarily [as] a means of reducing the numbers in senior [officer] grades when necessary, such as during a reduction in force." H.R. REP. No. 96–1462, at 27 (1980); *see* S. REP. No. 96–375, at 81 (1979) (similar); *see also* 126 CONG. REC. H29,886 (Nov. 17, 1980) (statement of Rep. Mitchell) ("It is the committee's strong desire that [majors] be continued to [a standardized] 20 years of service as a matter of course; only in unusual circumstances would this authority not be fully utilized."). This demonstrates that the SecAF has the authority to use selective continuation, as necessary, for reductions in force—not just for the removal of senior officers with derogatory information on their record.[6] It further shows that the SecAF has the discretion to determine who, outside the congressionally mandated two-year protective window, may be continued, according to the needs of the service.[7] The Secretary of Defense is charged with

---

[6]    Department of Defense regulation and policy reflects this understanding. *See* DoDI 1320.08 ¶¶ 4 ("It is [Department of Defense] policy to retain competent and effective commissioned officers through the selective continuation process as a cost-effective means of satisfying skill needs in the Military Services."), 5.2.1 (providing that the "Secretaries of the Military Departments shall" "[a]dminister the policy and procedures prescribe [in DoDI 1320.08]"), 5.2.3 (providing that the "Secretaries of the Military Departments shall" "[c]onvene continuation selection boards based on the needs of the Military Service concerned for continuation of officers on the Active Duty List").

[7]    Air Force regulation and policy reflects this understanding. AFI 36-2501 at ¶¶ 7.9 (providing that "[b]ased on the needs of the Air Force, [the SecAF] determines

14                                            BAUDE v. UNITED STATES

"prescribing regulations for the administration of [10 U.S.C. § 637]," 10 U.S.C. § 637(e), however, those regulations cannot be contrary to the express intent of Congress, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2142 (2016) (explaining that, to the extent Congress grants authority to promulgate regulations, those regulations must be "reasonable in light of the text, nature, and purpose of the statute").

## C. The Majority's Reading of DoDI 1320.08 ¶ 6.3 Undermines the Separation of Powers and Civilian Control of the Military

Preserving the SecAF's authority and discretion to use selective continuation within statutory and regulatory bounds is important because the SecAF must be able to meet congressionally mandated end-strength numbers. Article I of the Constitution gives Congress the power to "raise and support Armies," U.S. CONST. art. I, § 8, cl. 12, and "provide and maintain a Navy," *id.* art. I, § 8, cl. 13.

---

[continuation] eligibility criteria"), 7.10 ("All officers recommended for continuation must meet a selective continuation board that will ultimately be forwarded to [the] SecAF for final approval"); Appx 1001 (Air Force Selective Continuation Fact Sheet) (explaining that "[s]elective continuation allows the Air Force, as determined by the [SecAF], to retain twice-deferred officers in critical skills for a length of time determined by the [SecAF]"); Appx 1001 (providing that the "SecAF determines the selective continuation eligibility criteria" and that it may "change from board to board based on current and projected needs of the Air Force"); Appx 1001 (providing that the "worst case scenario" is that "continuation is not offered to anyone").

Each fiscal year, Congress "authorizes appropriations . . . for military activities of the Department of Defense," to, inter alia, "prescribe military personnel strengths for [that] fiscal year." NDAA FY11, 124 Stat. at 4137. Neither the Secretary of Defense nor the SecAF has the authority to "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." 31 U.S.C. § 1341(a)(1)(A); *see* Appx 1006–07 (Air Force Policy Directive 36-32, Military Retirements and Separations (July 14, 1993)) ("[T]he Air Force must be able to meet personnel strength levels established in law."). Congress's power to mandate end-strength numbers is central to civilian control of the military. *See* THE FEDERALIST NO. 41, at 225 (James Madison) (E.H. Scott ed., 1898) ("A standing force . . . is a dangerous, at the same time that it may be a necessary, provision. . . . A wise nation will combine all these considerations; and, whilst it does not rashly preclude itself from any resource which may become essential to its safety, will exert all its prudence in diminishing both the necessity and the danger of resorting to one which may be inauspicious to its liberties."). "[J]udicial deference to . . . congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981).

Further, the "composition of [military] forces" is "within the purview of the Congress and the military." *Maier*, 754 F.2d at 980. "Subject to the authority, direction, and control of the Secretary of Defense," the SecAF "is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Air Force, including," "organizing," "supplying," "equipping," "administering," and "maintaining" that force. 10 U.S.C. § 8013(b). "The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,

subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (emphasis in original)). It is well "settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983).

The Majority "fail[s] to give appropriate weight to this separation of powers," *Gilligan*, 413 U.S. at 11, and the "wide discretion [of the SecAF] to manage [the Air Force's] workforce," *Allphin v. United States*, 758 F.3d 1336, 1341 (Fed. Cir. 2014). Instead, the Majority's reading of DoDI 1320.08 ¶ 6.3 effectively gives the Secretary of Defense the means to make an end run around Congressionally mandated end-strength numbers, by giving the Secretary of Defense the authority to create an entitlement to continued employment in the military. *See* Maj. Op. 5 (explaining that the SecAF "must continue" an officer within the Secretary of Defense's prescribed protective window absent "reason not to," such as "derogatory information in [his or her] personnel file"). This is contrary to the "power of oversight and control of military force by elected representatives and officials" that "underlies our entire constitutional system[.]" *Gilligan*, 413 U.S. at 11. This is unquestionably in derogation of the good order and discipline of the armed services. *See Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("In the civilian life of a democracy many command few; in the military, however, this is reversed, for military necessity makes demands on its personnel without counterpart in civilian life." (internal quotation marks and citations omitted)). There is no right to remain in the military, *see Maier*, 754 F.2d at 980 ("No one has an individual right, constitutional or otherwise, to enlist in the armed forces[.]"), and no "liberty or property interest" attached to an honorable discharge "sufficient to invoke due process rights to notice and a hearing," *Allphin*, 758 F.3d at 1343. To the extent that an individual has any property interest, it is only a "reasonable expectation" in

continued employment—there is no reasonable expectation that an officer who does not meet the basic requirements and standards set by the SecAF for continued employment will be selected for continuation. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.").[8]

---

[8]    The Majority faults this Dissent for considering relevant legislative history and pointing out the constitutional implications of the Majority's opinion. *See* Maj. Op. 19 (characterizing this Dissent's consideration of legislative history in regulatory and statutory interpretation as "[a]dvancing new arguments on behalf of the [G]overnment"), 23 (rejecting this Dissent's consideration of the constitutional implications of the Majority's opinion as "attempts to bolster its reasoning with arguments that the [G]overnment has not advanced").  The Majority misapprehends the nature of our judicial process.  Our role is to "decide all relevant questions of law" and "interpret constitutional and statutory provisions" not just "when" or as "presented," but "[t]o the extent necessary to [the] decision[.]"  5 U.S.C. § 706.  Whatever the Government may argue, it cannot obviate our "province and duty . . . to say what the law is." *Marbury*, 5 U.S. at 177–78; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (explaining that a court must "resort[] to all the standard tools of interpretation" when determining whether a regulation is "genuinely ambiguous").  Judges are not advocates.  We do not "advance" arguments on behalf of the parties.  Our duty is to follow the law as we comprehend it.

II.  The Majority Overreaches Our Standard of Review to
Find Facts Not on the Record

Having misread DoDI 1320.08, the Majority then finds
that "even if the SecAF had the authority to declare any
circumstance to be sufficiently unusual to justify rewriting
other aspects of the regulation . . . there simply were no
'unusual circumstances' identified here." Maj. Op. 20. Spe-
cifically, the Majority finds, first, that "there were no 'unu-
sual circumstances' akin to derogatory information in [Mr.]
Engle's file that would have justified his non-continuation,"
*id.*, and second, that the SecAF found no broader unusual
circumstances because neither "[t]he SecAF's notice to the
USD(P&R)," nor his "memorandum of instructions" to the
selective continuation board "mention[s] . . . unusual cir-
cumstances of any kind," *id.* (citing Appx 1005; Appx 33).
In so doing, the Majority overreaches our standard of re-
view.

"We review a decision of the Court of Federal Claims
granting or denying a motion for judgment on the adminis-
trative record without deference." *Barnick v. United
States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010) (citation omit-
ted). As such, "we apply the same standard of review" as
the Court of Federal Claims, and "will not disturb the deci-
sion of the AFBCMR unless it is arbitrary, capricious, con-
trary to law, or unsupported by substantial evidence." *Id.*
(citation omitted).

First, the Majority finds, based on what it says is a
Government concession, that "there were no 'unusual cir-
cumstances' akin to derogatory information in [Mr.]
Engle's file that would have justified his non-continuation."
Maj. Op. 20 (citing Oral Arg. at 20:42–51, http://oralargu-
ments.cafc.uscourts.gov/default.aspx?fl=2018-2038.mp3
("We are unaware of any derogatory information or any de-
cision regarding [Mr.] Engle that was personal in nature,
that is not what the record here shows.")); *see id.* 8 (stating
that, if the SecAF had not changed the continuation

criteria Mr. Engle "almost certainly would have been continued"). This may be true; however, such a finding is improper and outside our role on appeal. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). There is simply no record evidence to support this finding. This is unsurprising: "The proceedings of a selection board convened under [10 U.S.C. § 611] may not be disclosed to any person not a member of the board, except as authorized to process the report of the board." 10 U.S.C. § 613a(a).

Second, the Majority finds that the "SecAF fail[ed] to identify any [unusual circumstance]" in his notice to the USD(P&R) or instructions to the selective continuation board, rendering the AFBCMR's affirmance unsupported by substantial evidence and the Government's arguments post-hoc rationalizations.   Maj. Op. 22; *see* SAppx 115 (AFBCMR concluding that Petitioners had submitted "insufficient relevant evidence" to "demonstrate . . . an error or injustice" and that "the explanation provided by [the Air Force] that the [SecAF] had a reasonable basis to pursue the course of action he determined necessary"). The Majority concludes that this "alone should end the inquiry." Maj. Op. 21 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 81 (1943)). The Majority mistakes an incomplete record for definitive proof of a negative claim. Specifically, before the Court of Federal Claims, Mr. Engle and the other Petitioners sought to compel the Government to supplement the administrative record with the evidence the Majority now seeks. *See* SAppx 147 (summarizing Petitioners' request that the Government "[p]rovide details . . . of the information [the] SecAF briefed to the [USD(P&R)] on January 24, 2011[,] regarding the SecAF's intent to not selectively continue certain officers," "of the information the Air Force briefed to [the] USD(P&R) and [c]ongressional subcommittee staff members on January 12, 13, and

24, 2011[,] regarding [the] SecAF's intent to not continue certain officers," and "of the information the Air Force briefed to [c]ongressional subcommittee staff members on March 17, 2011[,] and May 11, 2011[,] regarding the SecAF's intent to not selectively continue certain officers," including "copies of the brief[s] provided, briefing materials, transcripts, and any and all correspondence"). The Court of Federal Claims, however, denied this request, because Mr. Engle and the other Petitioners had "waived [their] supplementation rights" by failing to "identify this evidence [as] missing during [administrative] review," despite having been before the [AFBCMR] twice." SAppx 149. Mr. Engle does not contest this determination, *see generally* Appellant's Br; Appellant's Supp. Br., nor does the Majority address it, *see generally* Maj. Op. It is, therefore, undisputed that the Court of Federal Claims acted within its discretion when it denied Mr. Engle and other Petitioners' request. *See Barnick*, 591 F.3d at 1382 ("[We] review[] evidentiary rulings [of the Court of Federal Claims] under an abuse of discretion standard." (citation omitted)); *id.* at 1382 ("[W]here evidence could have been submitted to a corrections board and was not, the evidence is properly excluded by the Court of Federal Claims." (citation omitted)).[9]

Before the Court of Federal Claims, the burden was on Mr. Engle to establish "prejudicial error." 5 U.S.C. § 706; *see* 10 U.S.C. § 1558(f)(2). He did not. Rather, he conceded that the "SecAF was only required to notify [the] USD(P&R) of his intent to [not selectively continue larger

---

[9]     Even if such details of the SecAF's decision were on the record, it is unclear what the Majority could do with them. *See Adkins v. United States*, 68 F.3d 1317, 1322 (Fed. Cir. 1995) ("The merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review.").

pools of officers].” SAppx 150. He nonetheless now argues this absence of evidence to his advantage. *See* Appellant's Supp. Br. 7 (arguing that the “SecAF did not purport to identify any 'unusual circumstances' justifying the six-to-five-year change when making the determination not to selectively continue Mr. Engle,” and “[t]hat failure alone is error that requires reversal[.]”). His argument, in addition to being improper, is without merit. *See Dodson v. U.S. Gov't, Dep't of Army*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (“[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs.”); *see also Biddle v. United States*, 186 Ct. Cl. 87, 104 (1968) (providing for a “presumption in favor of the validity” of official military acts, such that “in the absence of any evidence to the contrary, it must be presumed that the [secretary] performed [his] official duties properly”).

## CONCLUSION

The plain language of DoDI 1320.08 ¶ 6.3, read in its statutory and regulatory context, aligned with Congressional intent and Constitutional principles, supports the conclusion that the SecAF has the authority and discretion to narrow continuation eligibility criteria and not continue large pools of officers within six years of retirement eligibility. The Majority opinion misreads DoDI 1320.08 ¶ 6.3, and, in so doing, erodes civilian control of the military and the good order and discipline of the armed services. In essence, what this Court is doing today is restricting the ability of the armed services to respond with fiscal agility to a continuously changing and complex global environment. That is clearly contrary to the Constitution, and the law, and to Congressional intent.

For these reasons, I respectfully dissent.