ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Northrop Grumman Corporation | ) | ASBCA No. 61775 |
| | ) | |
| Under Contract No. FA8620-13-D-3014 *et al.* | ) | |

APPEARANCES FOR THE APPELLANT: James A. Tucker, Esq.
David A. Churchill, Esq.
Daniel E. Chudd, Esq.
  Morrison & Foerster LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT: Arthur M. Taylor, Esq.
  DCMA Chief Trial Attorney
Robert L. Duecaster, Esq.
  Trial Attorney
  Defense Contract Management Agency
  Chantilly, VA

OPINION BY ADMINISTRATIVE JUDGE PROUTY

The appeal before us involves the application of the Cost Accounting Standards (CAS) to the "curtailment" of a pension plan, but it's not as abstruse as the uninitiated reader may fear. As will be explained in far more depth below, appellant, Northrop Grumman Corporation (NG), decided to freeze a particularly generous pension plan for senior management.[1] The costs of such pension plans are part of a company's overhead for purposes of cost-reimbursement contracts (of which NG had many), and when a pension plan is curtailed, the company must calculate the assets of the plan versus its obligations at the time the benefits were frozen. If the assets are greater than the present value of the obligations, it means the government "overpaid"[2] the overhead it previously paid the contractor and is entitled to a properly-proportionate refund. If the assets of the pension plan are calculated as less than the present value of its obligations (as happened here), the contractor's previously charged overhead costs are deemed to have been too low and the contractor is entitled to a proportionate payment from the government to

---

[1] By "freeze" we mean, ending further contributions to the plan and curtailing increased benefits based on such contributions. Persons entitled to the pension would still receive it upon retirement, but their payments would be based upon their years of service as of the date of the curtailment, rather than their years of services as of their retirement date.

[2] This "overpayment" is typically due to better than expected returns on investments or lower than expected costs.

remedy the situation. Thus, the means by which a contractor calculates both the value of the plan and its obligations are of keen interest to both the contractor and the government.

Here, the government objects to NG's calculations of both the value and the obligations of the pension plan. It objects to NG's calculation of the value of the plan because of the manner in which NG valued the future income of its assets, taking into account taxes on such income. It further objects to the actuarial mortality tables used by NG to determine the life expectancy of its pensioners and thus the plan's obligations: NG changed the mortality tables it used for the plan to ones more in its interest just as the plan was frozen. The government also objects to a one-time payment of tax liability by the plan incurred before curtailment, but paid afterwards.

Though we recognize why the government had its concerns, as will be described below, NG's approach accurately reflects the actual net value of the pension plan, such that any CAS non-compliance is not material, and we sustain the appeal in whole.

FINDINGS OF FACT

I. The Pension Plan and the Big Picture

The pension plan at issue in this appeal is known as the "OSERP," which stands for Officers Supplemental Executive Retirement Plan (Stip. ¶ 1[3]). NG adopted the OSERP on December 23, 2003 (Stip. ¶ 5). It is a "defined benefit pension plan," as defined by CAS 412-30(a)(10)[4], which means that the amount to be paid to pensioners or the basis for determining those benefits, is determined in advance (Stip. ¶ 6). It is also a "nonqualified pension plan," within the meaning of CAS 413-30(a)(18), which means that it does not qualify for preferential tax deferral under the tax code and implementing regulations by the Internal Revenue Service (IRS)[5] (Stip. ¶ 7). However, it is set up as a "Rabbi trust"[6] (so named after an IRS decision allowing the practice for a particular temple), which means that its assets may be attached by NG's creditors, but the pensioners need not pay

---

[3] The parties' joint stipulation of facts, dated August 29, 2019, may be found at tab 100 of appellant's supplemental Rule 4 file. We refer to it as "Stip. ¶__" throughout, for convenience.

[4] CAS provisions are published in 48 C.F.R. Part 9904, with the CAS provision being found in the decimal after the part number. Hence, for example, CAS 412-30(a)(10) is located at 48 C.F.R. § 9904.412-30(a)(10).

[5] The reason for this is that OSERP was limited to a very small number of highly compensated NG employees (tr. 1/43).

[6] The OSERP's assets are held by the trust (*see* Stip. ¶ 14), which was managed by the Evercore Trust Company (*see* app. supp. R4, tab 192 (amendment of trust agreement)), even if, as noted below, NG was responsible for its taxes. For simplicity, we will generally refer to OSERP assets, rather than trust assets throughout, unless it is necessary to make the distinction.

2

tax on the money set aside for their use until they actually begin collecting it (tr. 1/43-45). Of particular salience to this appeal, money earned by a Rabbi trust's investments is taxed as income to the company holding the trust (here, NG) (tr. 1/45-47).

Alas, the OSERP only lasted for approximately 11[7] years, with a "curtailment of benefits" effective on December 31, 2014 (Stip. ¶ 12). A curtailment of benefits, as defined by CAS 413-30(a)(7) is when the plan is "frozen" and no further benefits accrue to members except that the plan would allow vesting of unvested benefits based upon length of service and the plan would pay benefits otherwise already accrued (*Id.*).

During the period of the OSERP's existence, NG allocated its costs to numerous government contracts, all of which included the following standard Federal Acquisition Regulation (FAR) clauses that are material to the issue before us today: FAR 52.215-15, PENSION ADJUSTMENTS AND ASSET REVERSIONS; FAR 52.230-2, COST ACCOUNTING STANDARDS; and FAR 52.233-1, DISPUTES (Stip. ¶ 11). FAR 52.230-2(a), in turn, provides that the provisions of 48 C.F.R. Part 9903 (applying the CAS) are incorporated by reference into the contract.

Finally, the amount of the OSERP allocated to government contracts for which the CAS calculations apply is 81.93% (Stip. ¶ 46).

II. NG's Calculations After Curtailment

After curtailment was decided upon in 2014, NG began the process of calculating the OSERP's assets and liabilities so that the parties could properly determine what payment adjustments were required to make the plan's assets and liabilities equal pursuant to CAS 413. (*See* R4, tab 12 at G-284-86 (setting forth process NG undertook); tr. 1/63-93 (same)) These adjustments are basically to allow a one-time "settling up" of the OSERP accounts (tr. 1/41).[8]

The market value of the OSERP assets at the time of curtailment was determined by NG to be $91,964,173 – a figure that both parties agree was correctly calculated (Stip. ¶ 14). Subsequent to curtailment, NG made three other significant adjustments to

---

[7] We say 11 years and not 10 (given the December 23, 2003 date of the OSERP's creation), because NG computed the OSERP costs effective January 1, 2004 (Stip. ¶ 9). So far as we can tell, the difference in dates makes no material difference to this dispute.

[8] As will be seen below, there is some dispute between the parties of just what this "settling up" means. The government's position is that "settling up" refers to past costs. NG argues that it refers to setting assets and liabilities (including future costs) into balance.

3

its accounting of the OSERP's assets: one, a payment of $2,032,589 (as discounted)[9] made in late January 2015 to cover pension costs from the final quarter of 2014 (*see* Stip. ¶ 15); the second, an upward revision of NG's calculation of assets of $7,753,912 to account for duplicative retirement benefits accrued by employees who came to NG from another company (Stip. ¶ 16). The amount of this second adjustment is agreed by the parties to have been proper (*id.*). The third significant change to the assets was the trust's payment of $4,151,494 in Federal income taxes as reimbursement to NG for its payment of taxes on trust income during the OSERP's lifetime prior to curtailment (Stip. ¶ 24). Two other relatively small adjustments were made to account for minor administrative errors. It is enough to say that they are not material to the matters in dispute here and the parties agree that they were appropriate (Stip. ¶¶ 17-18).

In addition to the taxes actually paid by the trust after the OSERP's curtailment, which the government felt should not be considered (*see* gov't br. at 3-5), there were two other major bones of contention between the parties. First, with respect to calculating plan liabilities, NG used the "RP-2014" mortality table (published by the Society of Actuaries in 2014) to calculate the expected life expectancy of its pensioners to estimate how long it would need to pay the OSERP pensions. The RP-2014 table estimated longer lifespans for individuals than did the RP-2000 table (published in 2000) that NG had previously used for its annual calculations of the OSERP's liabilities.[10] (Stip. ¶¶ 26-27, 31) The difference in the OSERP's liability calculated by the two tables is approximately $10 million (Stip. ¶ 34), and the government believes NG should have stuck with the older table (Stip. ¶ 3).

The other major difference between the parties is the interest rate that NG used for calculating the future investment income on the OSERP's assets. NG estimated that its pre-tax rate of return on the OSERP's investments would be 6.15% annually. After deduction of the 35% top marginal tax rate then applicable to NG, this number was reduced to 4%. (Stip. ¶¶ 36-37, 43) The government did not object to the 6.15% estimated rate of return, but did object to NG's discounting it for taxes (Stip. ¶ 44).

Thus, using its numbers, NG calculated the market value of the OSERP's assets at the time of curtailment as $97,673,341 (Stip. ¶ 45 a.). NG calculated the OSERP's liabilities as $190,106,365 (Stip. ¶ 45 b.). The difference between the assets and liabilities were thus $92,433.024. Multiplied by the government's 81.93% share of

---

[9] The proper discount rate (in particular, whether it should take taxes into account) is a matter of dispute (*see* Stip. ¶¶ 15 a. - 15 c.), which will be discussed more at length later in this opinion.

[10] Because pension plan expenses are part of a company's overhead for calculation of its indirect costs (which the government is partially responsible for in certain contracts), they are submitted for review to the Defense Contract Audit Agency (DCAA) annually (tr. 1/54, 2/92 (NG's pension evaluation done in the beginning of the year and then placed into the incurred costs for the year)).

responsibility, this yields (according to NG) $75,730,377 owed by the government to NG to "true-up" the OSERP (Stip. ¶ 47).

III.   The Government's View and the Contracting Officer's Decision

The government sees things somewhat differently than NG.  Just before NG froze the OSERP, the government began expressing concerns about the manner in which it was taking account of taxes when it was calculating its investment income.  For many years, as part of its indirect cost rate submittals, NG disclosed to DCAA that it was reducing its projected investment income by 35% on account of taxes that would be paid on such income.  DCAA appeared to accept this without objection. (Tr. 1/90-91, 2/35-40, 45)  On April 10, 2014, however, DCAA issued an audit report on one of these submissions, asserting that NG's calculation of a lower investment income to account for taxes was non-compliant with CAS 412 (R4, tab 10 at G-266).  This audit report led to the issuance of a Notice of Potential Noncompliance to NG just a few days later, on April 15, 2014 (Stip. ¶ 40).  On July 20, 2015, the government went from calling this a "potential" problem to issuing a Final Determination of Noncompliance (Stip. ¶ 41).

On June 26, 2017, NG submitted a certified claim to the contracting officer (CO) seeking payment of $74,065,364[11] for its benefit curtailment costs (R4, tab 12; Stip. ¶ 51).  The CO denied the claim in a decision dated May 31, 2018 (R4, tab 22 at G-383-92; Stip. ¶ 52).  Even with the disagreements noted above, the CO found that the government owed NG $28,059,146.  Nevertheless, because (according to the CO) she did not have the authority to pay this money, she denied the claim in full.  (R4, tab 22 at G-391)[12]

IV.   A Deeper Dive On Information Material to the Dispute

A.   The Mortality Tables

As noted above, in October 2014, just a few months before the curtailment of the OSERP,[13] NG changed the mortality tables it used for calculating the OSERP's payment obligations to the "RP-2014" table, created by the Society of Actuaries (the Society) (Stip. ¶¶ 30-31).  NG had used the Society's "RP-2000" mortality table prior to this time (Stip. ¶ 26).

---

[11] NG reduced the amount it claimed by a little over a million dollars to credit certain pre-acquisition payments and certain pre-payment credits (R4, tab 12 at G-286).

[12] In our memory, we have never encountered a CO denying, in full, a claim that she determined to be partially owed to a contractor on the grounds of lack of authority. It is potentially problematic, to say the least, but we need not address it because we rule for NG in the end.

[13] Because of this timing, the change in tables was of no effect until after the curtailment date (Stip. ¶ 26 (RP-2000 used in all valuations prior to the curtailment date)).

The RP-2014 table, in fact, was first preliminarily published as an "exposure draft" in February 2014. This draft received significant attention in the actuarial community because it reflected that people were living longer, which is, of course, a very positive thing except that it increases the present value of future pension obligations. (Tr. 1/84) NG, in fact, initiated an internal project to determine the implications of the RP-2014 table for the company. By October 2014, in fact, NG made the decision that it would utilize the RP-2014 table for pension plans company-wide. (Tr. 1/85) Those other pension plans dwarf the size of the OSERP (*id.*), with the OSERP representing less than half of one percent of NG's total pension plan assets (*id.* at 96-97). NG's October decision to use the RP-2014 table company-wide was reflected in its December 31, 2014 10-K report to the Securities and Exchange Commission (app. supp. R4, tab 129 at A-533).[14]

Also in October 2014, the Society more formally published the RP-2014 table. With that table came a note from the Society's Retirement Plans Experience Committee, which stated that the table represented "the most current and complete benchmark[] of U.S. private pension plan mortality experience." (Stip. ¶ 29) The note further recommended the use of that table for measuring "private pension plan obligations, effective immediately" (Stip. ¶ 30). According to NG's expert, by the end of 2014, approximately 87% of the private pension plans that his office studied had adopted the RP-2014 table (tr. 1/86).

There was no evidence presented that NG adopted the RP-2014 for any reason relating to "gaming" the valuation of the OSERP. To the contrary, based upon the evidence before us, we conclude that NG's adoption of the RP-2014 mortality table for OSERP obligation calculations in October 2014 was part of a much larger company-wide move, consistent with the rest of industry, intended to utilize the most accurate information on life expectancy available, and not for any other reason.

B.  Taxes Paid and Owing By NG for the Plan's Investment Income

Though NG, as an entity, paid taxes on the OSERP's investment income, prior to the date of the curtailment, NG did not separately keep track of the taxes that it paid on income on OSERP assets. Instead, it calculated the value of the assets by discounting them by the 35% marginal tax rate. (Stip. ¶¶ 19-21)

Consistent with its failure to keep track of the taxes paid for the OSERP's income, the OSERP trust never compensated NG for the taxes it paid on its behalf before curtailment (Stip. ¶ 22). This amount, it has been since estimated by NG, was the sum of $4,151,494. At some point after the curtailment, NG requested reimbursement of this

---

[14] According to this report, the change in assumptions was made as of "December 3 , 20 4" (sic.) (R4, tab 129 at A-533). The apparent extra blanks after the 3 and between the 20 and 4 appear to reflect a "1" that was left out in each instance. We find it more likely than not that, whatever date was intended, it was prior to January 1, 2015.

amount from the OSERP trust. This was the first such request NG ever made to the trust for this purpose. (Stip. ¶¶ 23-24) The terms of the trust, however, did not explicitly provide for such re-imbursement. Accordingly, the trustee requested that the trust agreement be amended to do so. (Stip. ¶ 24 a.) This amendment, explicitly providing for the trust to reimburse NG for income taxes paid on its assets, was effected on June 30, 2016 (Stip. ¶ 24 b.; *see also* app. supp. R4, tab 192). Already having waited more than 10 years for the tax reimbursement, NG was apparently satisfied to wait almost another full year, with the reimbursement of the full $4,151,494 estimated tax amount being made on June 7, 2017 (Stip. ¶ 24 c.). Apparently, no interest was paid to NG on this late reimbursement, which means that the late payment was to the OSERP's advantage in that the fund obtained an investment return on the money that it held onto, rather than immediately paying to NG (tr. 1/148).

The CAS and the FAR have some things to say about taxes. Generally, income taxes are not considered a cost that is reimbursable by the government in a cost reimbursement contract. FAR 31.205-41(b)(1). On the other hand, they are a reimbursable expense for retirement plans. Of interest in this dispute, though, the CAS explicitly provides that tax liability may not be used to recalculate rates of return even as it allows taxes as an expense. CAS 412-50(a)(5).[15]

###    C.   Context From The Experts

As will be discussed more in the Decision portion below, we do not cede our obligation to interpret CAS provisions to expert witnesses. We did, however, without objection, permit testimony by experts from both parties to explain accounting concepts, the way Rabbi trusts work, the consequences of applying different accounting concepts to the circumstances presented here, and the calculations performed with respect to the OSERP. It was testimony from NG's expert that explained what a Rabbi trust is (*see* tr. 1/43-45); the industry-wide adoption of the RP-2014 table in late 2014 (tr. 1/84-88); the benefits to the OSERP (and the government) by NG's failure to seek compensation from the OSERP trust for its tax liabilities until after curtailment (tr. 1/148); and the practical differences between treating taxes as an administrative cost of the trust and using them to reduce the investment income rate (tr. 1/134-35). The government's actuarial expert testified that, if one were only interested in balancing assets and liabilities for actuarial purposes (as opposed to whatever the CAS might require), considering future taxes would be appropriate (tr. 2/82-83).

---

[15] Often the Board's practice is to include full recitations of applicable regulations in the "Facts" portions of our decisions because, after all, they act as contract provisions. We will spare the reader temporarily and recite them in the Decision section of this opinion, where it will be more convenient as we parse the provisions' meanings.

## DECISION

### I.  Preliminary Matters:

#### A.  The Government's Motion to Amend its Answer

Prior to the hearing, the government moved to amend its answer to add the affirmative defense of the statute of limitations.  NG opposed this motion, essentially arguing that the amendment would be futile since the government's putative statute of limitations defense was meritless.  At a status conference before the hearing, we discussed the matter with the parties.  All agreed that the evidence would be largely the same whether or not the government motion to amend was granted.  Thus, as a matter of judicial economy, we deferred ruling on the motion until after the hearing, since a grant or denial of the motion on grounds related to the merits of the defense would require a three-judge panel and it was best to avoid the delay that issuing such a decision would occasion.  We directed the parties to present the same evidence that they would if the motion to amend were granted, and all understood.  (*See* tr. 1/5-6 (summarizing decision))

As NG has pointed out in its reply brief, the government has presented no argument in support of the statute of limitations affirmative defense in its post-hearing brief, nor did it raise the issue in its brief opening statement during the hearing (tr. 1/16-25).  Under the circumstances, we deem the affirmative defense waived.[16]  Because the defense is waived, there is no point in amending the answer to add it, thus we deny the motion to amend the answer as moot.

#### B.  The Proper Means of Interpreting the CAS and the Role of the Expert Witness in a CAS Case

Technically, the CAS are nothing more than government regulations, albeit those of a highly specialized variety.  As such, a tribunal interpreting them applies the usual means of regulatory interpretation.  Thus, as the Federal Circuit has stated, our "task is 'to ascertain the [CAS Board's] intended meaning when it promulgated the CAS.'" *Allegheny Teledyne, Inc. v. United States*, 316 F.3d 1366, 1373 (Fed. Cir. 2003) (quoting *Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed. Cir. 1995)).  To that end, we start with the text of the CAS provisions at issue and consider "'any guidance that [the CAS Board] has published to aid in interpretation.'"  *Id.* (quoting *Martin Marietta*, 52 F.3d at 1138).  *See also Martin Marietta*, 47 F.3d at 1137-39 (considering preambles and illustrative examples published by the CAS Board accompanying the CAS).

---

[16] The CDA's statute of limitations is not a jurisdictional defense, *see Sikorsky Aircraft Corp. v. United States*, 773 F.3d 1315, 1320-22 (Fed. Cir. 2014), and may thus be waived.

With that direction in mind, though we permitted expert testimony in this matter from both parties, without objection, it is important to note what their proper use is here. As the Federal Circuit explained in *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361 (Fed. Cir. 2003):

> [T]he interpretation of CAS . . . is an issue of law, not an issue of fact . . . . The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That interpretive issue is to be approached like other legal issues— based on briefing and argument by the affected parties.

315 F.3d at 1369 (footnote omitted); *see also Sikorsky*, 773 F.3d at 1323. Thus, when we interpret the CAS provisions at issue here, we do not take into account the experts' opinions of what they mean. That does not mean that the experts were unhelpful to our resolution of this appeal, for as described below, they can illuminate accounting concepts that aid us in avoiding interpretations that would be inconsistent or nonsensical.

## II.   The Burden of Proof is on the Government

This matter is straightforward:  after a contractor has performed a curtailment calculation, the burden of proof is on the government to establish, with a preponderance of the evidence, that the contractor's calculations violated the CAS. This was most plainly stated in an analogous matter (a "segment closing"[17] rather than a curtailment) by the Court of Federal Claims in *Raytheon Co. v. United States*, 105 Fed. Cl. 236, 270 (2012). *Raytheon* (which is not binding upon us but we find to be persuasive authority) cited our own case of *General Dynamics Corp.*, ASBCA No. 56744, 11-2 BCA ¶ 34,787 at 171,214, for this proposition. *See* 105 Fed. Cl. at 270. Though *General Dynamics* was about the application of CAS 412 and the calculation of retirement plan forward pricing rates rather than a plan curtailment or segment closing, we, nevertheless, find the circumstances similar enough to the application of CAS 413 to come to the same conclusion (as did the Court of Federal Claims in *Raytheon*). Moreover, we have long held, in general terms, that the burden of proof is on the government to prove noncompliance with CAS. *E.g.*, *Ball Corp.*, ASBCA No. 49118, 00-1 BCA ¶ 30,864 at 152,357-58.

---

[17] A segment closing is where the contracts of a "segment" (which, in general terms, is a division or subdivision of a company reporting to its home office) are separated or closed off from their pension costs, such as when the division is sold to another company or shut down. *Allegheny Teledyne*, 316 F.3d at 1374.

The government does not dispute that it has the burden of proof.

III.  The CAS Required a Best Estimate of the OSERP's Assets and Liabilities Upon its Curtailment so That it Would be Able to Meet its Future Obligations to its Pensioners.

A foundational key to the dispute here is just what determination must be made at the time of the curtailment of benefits event.  The relevant portion of the CAS, CAS 413-50(c)(12), begins as follows:

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated.  The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs.

CAS 413-50(c)(12).

Despite its seemingly black-and-white nature, the parties interpret the preceding paragraph differently in a way that appears subtle at first blush, but may make a difference in the outcome of this appeal.  The government view is backward-looking: that the adjustment is designed to ensure that all previous pension funding had been done correctly and not to look forward to what the pension's expenses and assets might be in the future (*see* gov't br. at 9 ("The adjustment answers the questions, 'What would the Parties have calculated as the annual costs of the Plan, had they known what the Plan's true earnings and liabilities would have been up to and including December 31, 2014.")).[18]  NG is of the view that the adjustment is intended to set up the pension (as best as can be estimated) for the remainder of its existence (app. br. at 23-24).  In support of its view, NG cites the Court of Federal Claims case of *Raytheon*, *supra*, which (citing multiple cases), stated, "'the end goal pursued by both the government and the contractor is to settle-up and pay their fair shares to ensure that the pension plans at issue are fully-funded to meet the promises made to the employee-participants covered by the pension plans.'"  (App. br. at 24 (quoting *Raytheon*, 105 Fed. Cl. at 240)  The cases cited by the Court of Federal Claims in *Raytheon* are not as direct on this point as that opinion is, nevertheless, we find this short synthesis to have the virtue of making sense, for what other purpose is to be served if the balancing of liability and assets is not meant to set the

---

[18] To be fair to the government, it is looking backwards towards past estimates of future expenses, so it does not completely ignore the fact that the expenses lie in the future (*see* tr. 2/17-19).

pension plan up to cover the contractor's employees once it is closed?  Of more legal consequence, when *Raytheon* was appealed to the Federal Circuit, our supervisory court agreed with the trial court's approach, re-iterating that "the goal of a segment closing adjustment is to determine the present value of the pension plan at the time of the segment's closing and to adjust the plan's value to ensure it is fully-funded to meet the promises made to the plan's participants."  *Raytheon v. United States*, 747 F.3d 1341, 1346 (Fed. Cir. 2014).

The government's basis for challenging *Raytheon* (the government argument was about the Court of Federal Claims case, not the Federal Circuit opinion reviewing it because NG had not cited it in its opening brief, although this makes no difference to the argument) is that it is inapplicable, since that case involved a segment closing and not a plan curtailment as we address in today's appeal (*see* gov't br. at 13-14).  This is not a particularly compelling argument:  the procedures required by CAS 413-50(c)(12) apply to when "a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits," thus, the provision makes no distinction between how segment closings and curtailments of benefits are to be treated.  CAS 413-50(c)(12).

We finally note that the CAS requires that the contractor use its best estimates when determining the values of a pension plan's assets and liabilities.  The CAS Board's Prefatory Comments to the 1995 Revisions to CAS 412 and 413 (comments we may and should consider in interpreting the CAS as previously noted) included a response to a comment regarding a particular type of cost accounting.  This response referred to "the requirement that actuarial assumptions be individual best-estimates of future long-term economic and demographic trends . . . ."  Cost Accounting Standards for Composition, Measurement, Adjustment, and Allocation of Pension Costs, 60 Fed. Reg. 16,533, 16,539 (Mar. 30, 1995) (reproduced at app. supp. R4, Tab 101 at A-23).  Consistent with these comments, CAS 412-40(b)(2) states directly that "[e]ach actuarial assumption used to measure pension cost shall be separately identified and shall represent the contractor's best estimates of anticipated experience under the plan, taking into account past experience and reasonable expectations."  To be sure, the adjustment at issue here is being undertaken under the auspices of CAS 413, not 412, but we have previously applied the CAS 412-40(b)(2) "best estimates" requirement to CAS 413 adjustments, *see Gould, Inc.*, ASBCA No. 46759, 97-2 BCA ¶ 29,254 at 145,544-46, and see no reason to depart from this sensible approach.  Using the best estimates, of course, is consistent with the notion of attempting to obtain the most accurate determination of the balance between assets and liabilities as the plan is curtailed.

IV.  NG's Use of the RP-2014 Mortality Tables Was The Best Way to Estimate the OSERP's Liabilities and was Consistent With the CAS

As a simple matter of fact, the RP-2014 mortality tables provide superior data for determining the OSERP's liabilities than their predecessor, the RP-2000 tables.  Indeed, the government's sole objection to the use of the RP-2014 tables was that NG had not

used them prior to the curtailment event and thus, in the government's view, they were not "consistent" with the earlier actuarial assumptions made in valuing the OSERP (gov't br. at 5-9). During the hearing for this appeal, the undersigned asked the government's actuarial expert, Mr. Richard Olness, whether he "would . . . have a problem with using [a hypothetical] RP-2013 table for the . . . curtailment event" had it been available and NG begun to use it the year before, to which Mr. Olness responded, "I think not." (Tr. 2/20) Thus, the question is whether, and under which circumstances, the CAS permit contractors to update their actuarial assumptions[19] in the plan curtailment calculation set forth in CAS 413.50(c)(12).

The CAS provision relied upon by the government to preclude the use of RP-2014 because it was not utilized in prior years is CAS 413-50(c)(12)(i) (*see* gov't br. at 5-6)[20] which provides in relevant part that, "[t]he actuarial assumptions employed [in determining actuarial liability] shall be consistent with the current and prior long term assumptions used in the measurement of pension costs." Thus, in the normal course of events, contractors are prohibited from revising their actuarial assumptions as part of the settling-up process. *See General Motors Corp. v. the United States*, 78 Fed. Cl. 336, 343 (2007).

However, we also note that the Prefatory Comments to the 1995 Revision of CAS 412 and 413 which was cited above to support the use of best estimates of future liability, quoted in larger part provides:

> Consistent with the requirement that actuarial assumptions be individual best-estimates of future long-term economic and demographic trends, this final rule requires that the assumptions used to determine the actuarial liability *be consistent with the assumptions that have been in use.* This is consistent with the fact that the pension plan is continuing even though the segment has closed or the earning of future benefits have been curtailed. *The [CAS] Board does not intend this rule to prevent contractors from using assumptions that have been revised based on a persuasive actuarial experience study* or a change in a plan's investment policy.

60 Fed. Reg. 16,533, 16,539 (reproduced at R4, tab 101 at A-23) (emphases added).

Although the government argues that these provisions specifically preclude the use of data in a curtailment calculation that has not been used in previous annual pension

---

[19] Contractors are required to disclose the actuarial assumptions used to measure pension cost. CAS 412.40(b)(2).

[20] The government's brief refers to CAS 413-50(a)(12)(i) rather than CAS 413-50(c)(12)(i) (emphasis added), but that was plainly a typographical error.

calculations, the situation here appears to be exactly the type of "persuasive actuarial experience study" contemplated by the CAS Board in its comments, and we do not perceive the CAS to be so inflexible as to require the use of prior assumptions that were replaced after the most recent CAS 412 disclosures.

We apply this regulatory construction to the facts here. By October 2014, before the OSERP's curtailment calculations began, NG made the corporate decision to use the RP-2014 tables. By virtue of this date alone, we could conclude that NG's "current" actuarial assumptions at the time of the curtailment were to use the RP-2014 tables. Moreover, as we concluded in our findings of fact, NG's move to the RP-2014 tables, as being part of a much larger decision, was made for the reason of using the most accurate tables and not as a subterfuge to increase calculated actuarial liability and obtain more money from the government.[21] We conclude then, that use of the RP-2014 tables was consistent with the CAS Board's guidance and was allowable.

V. <u>NG's Consideration of the Effect of Income Taxes Upon the OSERP's Assets Was Not Consistent With The CAS, But Did Not Constitute A Material Violation Because Consideration of Taxes as an Expense Was Permissible and Leads to the Same Result</u>

There are two issues before us involving the payment of income taxes by the OSERP. The first is whether the valuation of the OSERP's assets as of December 31, 2014 (the date of closure) should have included the more than $4 million that NG had paid on the trust's behalf but for which it had not yet sought reimbursement at the time of the curtailment. The second is whether, NG, by including the effects of taxes in its investment return calculations, materially violated the CAS. In each instance, we find that the government has not demonstrated a material violation.

---

[21] Had we found otherwise, it may have affected our finding that the change in these actuarial assumptions was based upon persuasive actuarial study or was NG's "best estimate." In *Gould*, for example, we held that a contractor's changing its mortality tables solely for purposes of taking advantage of its "last chance" to adjust its actuarial liability (to its benefit) in a segment closing was not in compliance with the CAS because it suggested that the contractor had different "best estimates" for purposes of CAS 412 and CAS 413. *See* 97-2 BCA ¶ 29,254 at 145,544-46; cf. *General Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1379 (Fed. Cir. 2013) (contractor's attempts to change actuarial assumptions to take advantage of short term changes to its advantage rejected). Interestingly, the government neglected to cite to *Gould*, which appears to be the closest case on point for this issue, but the case is distinguishable from our case here in any event because by the time of the OSERP's curtailment, the RP-2014 standard was considered NG's "best estimate" across all of its pension plans.

13

A.  The Adjustment to the OSERP's Liability for Taxes Already Owing to
    NG Was Allowable

There is no dispute between the parties that taxes on the earnings of a Rabbi trust "are a valid expense of the pension plan . . . ." *See* 60 Fed. Reg. 16,533, 16,538 (reproduced at app. supp. R4, tab 101 at A-22) (CAS Board's response to public comments regarding proposed 1995 changes to CAS 412 and 413).  There is also no dispute (because the parties stipulated to it) that NG paid approximately $4,151,494 in taxes on behalf of the OSERP in the ten years of its existence prior to curtailment, but did not receive compensation for this until June 2017, some two and a half years after the curtailment event.  To the government, this means that the expense had not been incurred as of the date of the curtailment and thus it must not be included in the calculation (gov't br. at 3-5).

While we agree that NG's relatively loose handling of the trust's obligations to compensate NG for incurred income taxes (as detailed in the government's brief) make this a closer call than it otherwise would be, we are persuaded as a matter of fact, especially given the parties' respective burdens of proof, that the tax obligation was a cost incurred prior to the curtailment event and should properly have been considered in adjusting the OSERP's valuation.  We come to this conclusion for the simple reason that the undisputed evidence is that the trust owed this money to NG as noted in our findings of fact.  To be sure, the terms of the trust (until amended more than a year after the curtailment) did not explicitly address its tax obligations to NG, but those terms did not explicitly hold otherwise, either.  Since the trustee willingly made the change "to clarify" the trust's obligations, we found that it was an obligation of the trust to NG incurred at the time of the payment.  Certainly, as a matter of its own self-interest, it would make no sense for NG to have intended to absorb these costs itself when, as a corporate cost, they would not be reimbursable by the government, *see* FAR 31.205-41(b)(1), but as a trust cost, the tax costs would be largely paid by the government (as properly allocated).  Thus, we conclude that the taxes on the earnings of trust assets were always intended to be paid by NG but reimbursed by the trust and that the trust's payment to NG for them was appropriately accounted for by NG under CAS 413-50(c)(12).[22]

_____

[22] As discussed in more detail below, CAS 412-50(a)(5) requires that the taxes be treated as an administrative expense of the plan and not as a reduction to the earnings assumption, which is how NG, in fact, accounted for the taxes.  Thus, it appears that NG failed to record the taxes as an expense in the proper cost accounting period.  While CAS 413-50(c)(12) permits the pension surplus or deficit to be recognized as a current period adjustment to previously determined pension cost, it is not clear that it permits the contractor to assign prior period costs, not previously charged to the government, to the current cost accounting period.  This possible CAS non-compliance may be the origin of the government's assertion at the hearing that the CAS requires current period reimbursement by the trust for the taxes to be allowable (tr. 1/204-05).  However, the government does not make this

B.  Considering The Value of the Assets as to be Discounted by Future Taxes, Though Improper, Was Not Materially Different Than the Permissible Practice of Considering Taxes to be an Expense

The most difficult challenge for NG in this appeal is how to reconcile its actuarial approach of reducing its investment rate of return by taking account of taxes with the provision of the CAS that specifically precludes that practice. CAS 412-50(a)(5) is the relevant provision, which states in material part:

> Income taxes paid from the funding agency of a nonqualified defined-benefit pension plan on earnings or other asset appreciation of such funding agency shall be treated as an administrative expense of the fund and not as a reduction to the earnings assumption.

Thus, NG's approach appears to be explicitly forbidden by the CAS, a fact that does not miss the attention of the government, which argues that, in the CAS 413 final true-up, NG should not have used an investment return rate of 4%, but, instead, should have used the 6.15% before-taxes rate for estimating the value of OSERP assets (gov't br. at 12-13, 15). As far as taxes-as-costs goes, the government argues that the use of the word, "paid" (past tense) in the CAS provision cited above means that the CAS forbids projecting future taxes in the CAS 413 context (*see* gov't br. at 12) and appears to argue that we read this as meaning that NG can claim tax costs on the OSERP as it incurs them in the future (gov't br. at 13). For reasons to be discussed below, this would be extraordinary.

NG's response is, initially, not so compelling. In general, it urges us to view the government's reading of the CAS as "hyper-technical" (app. br. at 1, 27, 53) which, on its face, only means that it is correct. More persuasively, NG points us to FAR 30.602(c)(1), Materiality, which provides that the government should make no adjustment to the contract when there is no material cost difference due to the CAS violation. NG argues that calculating the investment return as discounted by the percentage of taxes applicable to them provides the same result as calculating the return and then factoring in the taxes as an administrative expense, meaning that the difference in numbers is immaterial and its violation of the CAS is of no moment. (App. br. at 37-38) As a demonstration of this materiality defense, NG points us to the fact that DCAA and the CO long recognized what it was doing and were satisfied that the OSERP was CAS compliant – at least until 2014 (app. br. at 37-39).

---

argument in its post-hearing brief (gov't br. at 7-8), and consents to other non-current period adjustments to the pension balance that accrue to its favor. Thus, though we decline to go down this rabbit-hole today, this opinion should not be read as making a finding, one way or another, whether the government could successfully advance this argument in future appeals.

The government's acceptance of NG's pre-2014 OSERP projections does reflect that, as a matter of mathematics, the figures were the same, but it does not explain why the CAS (as interpreted by NG) would have made the distinction between making taxes an administrative expense as opposed to the more straightforward reduction in earning.[23] In short, if our interpretation of this CAS provision was that it made no difference, we would be presented with a regulatory interpretation that left portions of it "inoperative or superfluous, void or insignificant," an interpretation that is disfavored by the law. *See, e.g.*, *Baude v. United States*, 955 F.3d 1290, 1305 (Fed. Cir. 2020) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). We refer to this as "the nullity problem."

But, although the distinction between taxes as an expense and taxes as a reduction in earnings may be non-existent for purpose of CAS 413 adjustments, that is not the case in the matter of CAS 412, dealing primarily with annual pension costs, which is where the subject provision resides. NG argues that, in the case of annual pension costs, taxes as an expense would be realized the year in which they are paid, while a reduction in earnings would be reflected in the year of those earnings – one year earlier (app. br. 45-46; *see also* tr. 1/134-35 (response from NG's expert to question from the undersigned)). This one-year difference could have a material effect on the actual costs charged to the government if the taxes are not identical from year to year (and they would unlikely be). The government does not respond to this argument. Thus, we are satisfied that NG's construction of CAS 412-50(a)(5) in which there is no material difference between taxes-as-expenses and taxes reducing investment income for purposes of CAS 413 adjustments but there is a material difference for purposes of calculating annual expenses, is a satisfactory resolution of the nullity problem.

This leaves the government's remaining argument, that "taxes paid" must be past tense, and therefore they cannot be projected as an expense. This argument would be more persuasive if the past tense language in CAS 412-50(a)(5) were, instead, found in CAS 413-50(c)(12), the subsection governing segment closings and plan curtailments. To be sure, as noted above, we apply the CAS 412 standards to the CAS 413 calculations, but we cannot ignore the fact that CAS 412 was written for annual valuation of pension plan costs, while the governing CAS 413 provisions are aimed at making final adjustments to the pension plans for the rest of their foreseeable lives. Under those circumstances, relying on the tense of the verb "pay" for taxes as used in CAS 412 is far too slender a reed for the government's interpretation to rest upon.

---

[23] NG does not make the argument that the government's prior acceptance of its approach should act as a waiver of its compliance (*see* app. br. at 38 (disclaiming the argument)). That is wise, because we have held that, absent affirmative misconduct, the DCAA's prior allowance of improper indirect cost submissions does not act as such a waiver. *Tech. Sys., Inc.*, ASBCA No. 59577, 17-1 BCA ¶ 36,631 at 178,387.

Importantly, were we to read this section of the CAS as the government would have us, we would be presented with an untenable interpretation of CAS 413-50(c)(12). As we understand it, the government argues that, if NG encounters tax expenses on the OSERP in future years, those expenses would be "recovered" by NG "in the same way it recovers future administrative expenses of the Plan." (Gov't br. at 13) In other words, the government is arguing that administrative expenses (which include taxes) can be recovered by the contractor in the years following the CAS 413-50(c)(12) adjustment.[24] It is not clear just *how* that would occur, because we are aware of no CAS provision that permits the annual recouping of expenses on pensions allocable to segments in the years *after* they are closed or of pensions that have been curtailed *after* the curtailment, and the government has pointed us to no such provision. Moreover, such an adjustment would be contrary to the point of CAS 413-50(c)(12), which, as discussed above, is to "determine the present value of the pension plan at the time of the segment's closing and to adjust the plan's value to ensure it is fully-funded to meet the promises made to the plan's participants." *Raytheon*, 747 F.3d at 1346. The CAS 413-50(c)(12) process does not envision the contractor continuing to go to the well of the government as it incurs new expenses – for in the case of a segment closing, such a return would not be possible.

Indeed, the government's interpretation, which allows for annual recoupment of administrative costs after the segment closing or plan curtailment, is also contrary to the CAS's view of how to address future administrative expenses. As NG points out (app. reply br. at 16-17), CAS 413-30(a)(2)[25] includes the present value of *future* administrative expenses in its definition of actuarial accrued liability. And, of course, the CAS 413-50(c)(12) calculation is all about actuarial accrued liability (and the market value of plan assets). Thus, the CAS 413-50(c)(12) calculation includes future administrative expenses (of which taxes are a species), and they are not put off for some future reckoning.

Thus, we conclude that considering taxes in estimating the OSERP's actuarial accrued liability was not CAS-compliant, but that the result here, of calculating them as a discount to the interest rate applied to the plan's investments, was not material and generated an identical result, which we need not revisit.

---

[24] Surely, government counsel cannot intend to open the door to contractors seeking such expenses annually.

[25] Actually, NG's brief cites CAS 412-30(a)(2), which has an apparently identical definition of actuarial accrued liability. We believe the same definition's location in CAS 413 more persuasively advances NG's argument.

CONCLUSION

The appeal is sustained in whole.  We understand that the government has already begun compensating NG for some of the funds that the CO acknowledged were due and owing to it.  This appeal is remanded to the parties to calculate the amount currently due and owing from the government to NG.

Dated:  October 7, 2020

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61775, Appeal of Northrop Grumman Corporation, rendered in conformance with the Board's Charter.

Dated:  October 7, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

18